**STATE of Minnesota, Appellant,**

v.

**Daniel Lee MUZIK, Respondent.**

No. C5–85–952.

Court of Appeals of Minnesota.

Dec. 31, 1985.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Paul A. Rajkowski, Waite Park City Atty., St. Cloud, for appellant.

Michael O. Burns, St. Cloud, for respondent.

Heard, considered and decided by Crippen, Presiding Judge, Wozniak, Judge, and Lansing, Judge.

## OPINION

LANSING, Judge.

This appeal raises the question whether a police checkpoint or roadblock set up to detect drinking drivers violates the fourth amendment of the United States Constitution. The trial court found the checkpoint stop unconstitutional and suppressed all evidence against Daniel Muzik obtained as a result. We affirm.

## FACTS

From 10:00 p.m. to 2:00 a.m. on October 4–5, 1984, officers of the Waite Park Police Department and deputies from the Stearns County Sheriff's Department conducted a checkpoint/roadblock in the City of Waite Park. Respondent Daniel Muzik was stopped at this checkpoint during the early morning hours of October 5, 1984. As a result of the stop, Muzik was arrested and charged with driving under the influence of alcohol.

At an omnibus hearing held to determine the validity of the stop, the Waite Park chief of police, Kenneth Dickinson, testified that the purpose of the roadblock was to conduct a "safety check," for headlights, taillights, directional signals, and driver's licenses. At a meeting at the police station in advance of the checkpoint operation, Dickinson told the 14 to 16 officers involved to stop every vehicle that came into the checkpoint area, ask the driver to produce a driver's license, and look for "violations of equipment and so forth."

Chief Dickinson chose the particular stretch of road for the "safety check" because it was "a well travelled roadway," and because of an adjacent "well-lit" parking lot for channeling the motorists. An oncoming motorist would see a "city vehicle with a caution light in the area to show people there was something going on." Officers directed traffic into the parking lot with the aid of flashlights.

Dickinson said there was no official or published public notice that the checkpoint would be in operation. The checkpoint was initiated and organized solely at the discretion of Chief Dickinson. The mayor of Waite Park visited the checkpoint, but only in response to a citizen's call.

Finally, Dickinson testified that

due to the public concern about people drinking and driving and so forth, it was publicized last year through the Mother's Against Drunk Drivers that safety checks should be conducted periodically by different departments. My department was one, St. Cloud P.D. was another, and I think there was another one conducted in the Benton County area. However, due to that type of thing we had a safety check conducted in October of '83 and I decided again to conduct one in October of '84.

Dickinson acknowledged that part of his motive in setting up the checkpoint was public concern about drunk drivers.

The trial court found that the primary purpose of the checkpoint was to arrest drivers who were under the influence of alcohol, that every vehicle travelling the roadway was stopped, and that the stops were made without regard to probable cause and without specific and articulable facts for stopping each vehicle. The trial

court also found that there was no advance warning of the roadblock to approaching motorists. The trial court suppressed all evidence gathered as a result of the stop, ruling the checkpoint detention violated the fourth amendment of the United States Constitution and article 1, section 10, of the Minnesota Constitution.

The State in its brief to this court asserts that the length of each detention was 45 to 90 seconds, unless violations were observed, and that

[d]uring the safety check, 74 warning tickets were issued for equipment violations, three tickets were issued for expired registration, one ticket was issued for driving after revocation and three tickets were issued for driving while under the influence.

Although these statements do not have evidentiary support in the record, Muzik accepted the State's account of the facts, and we incorporate them on review.

### ISSUE

Did the Waite Park checkpoint violate the fourth amendment?

### ANALYSIS

■ A checkpoint stop of an automobile and its occupants is a "seizure" within the meaning of the fourth amendment. *United States v. Martinez-Fuerte*, 428 U.S. 543, 556, 96 S.Ct. 3074, 3082, 49 L.Ed.2d 1116 (1976). In upholding the permanent checkpoints established in *Martinez-Fuerte* for detecting incoming illegal aliens, the Supreme Court made it clear that automobile stops without probable cause or a reasonable suspicion of criminal conduct are not *per se* violative of the fourth amendment.

■ Instead, the Court has instructed that

[t]he reasonableness of seizures that are less intrusive than a traditional arrest, [citations omitted] depends "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *Pennsylvania v. Mimms,* 434 U.S. 106, 109 [98 S.Ct. 330, 332, 54 L.Ed.2d 331] (1977) * * *. Consideration of the constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.

*Brown v. Texas,* 443 U.S. 47, 50–51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979).

The United States Supreme Court has not decided the constitutional validity of a DWI checkpoint and thus has not balanced the competing fourth amendment interests. In *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), the Court held that random driver's license and registration-check stops of single automobiles violated the fourth amendment. However, in dicta the Court stated:

This holding does not preclude the State of Delaware or other States from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion. Questioning of all oncoming traffic at roadblock-type stops is one possible alternative.

*Prouse* at 663, 99 S.Ct. at 1401 (footnote omitted). This dicta, approving roadblock stops, has spawned a great deal of constitutional litigation.[1] Our survey of the cases

1. Our research discloses that the appellate courts of 16 states have been presented with the constitutionality of checkpoints for either DWI or license violations. Some courts hold all DWI checkpoints absolutely unconstitutional: *People v. Bartley,* 125 Ill.App.3d 575, 80 Ill.Dec. 894, 466 N.E.2d 346 (1984); *State v. Smith,* 674 P.2d 562 (Okla.Crim.App.1984). Some courts have indicated that properly conducted DWI checkpoints would be constitutional, but ruled the particular checkpoint in question unconstitutional: *State ex rel. Ekstrom v. Justice Court,* 136

Ariz. 1, 663 P.2d 992 (1983); *Jones v. State,* 459 So.2d 1068 (Fla.Dist.Ct.App.1984, question certified to Fla.Sup.Ct.); *State v. McLaughlin,* 471 N.E.2d 1125 (Ind.App.1984); *Commonwealth v. McGeoghegan,* 389 Mass. 137, 449 N.E.2d 349 (1983); *State v. Kirk,* 202 N.J.Super. 28, 493 A.2d 1271 (1985); *State v. Olgaard,* 248 N.W.2d 392 (S.D.1976). *See also Koonce v. State,* 651 S.W.2d 46 (Tex.Crim.App.1983) (driver's license checkpoint unconstitutional). The Iowa Supreme Court declared a roadblock set up to stop

accords with Professor LaFave's conclusion that "a DWI roadblock is constitutional if properly conducted." 3 W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 10.8(g) (1978) (Supp.1985 at 190). In order to determine whether the Waite Park checkpoint was constitutionally conducted, we apply the balancing test delineated in *Brown v. Texas.*

The *Brown* balancing test addresses first the gravity of the public concern served by this seizure. In *Heddan v. Dirkswager,* 336 N.W.2d 54 (Minn.1983), upholding the constitutionality of prehearing license revocation proceedings, our supreme court observed that

> [s]tatistics linking drunken driving with the tragedy of death and injury on our nation's highways abound. Forst Lowry, the Safety Program Coordinator for the Minnesota Department of Public Safety, testified that in 1981 52% of the drivers killed in Minnesota had a blood alcohol concentration of .10 or more and 62% of drivers killed had some measureable alcohol concentration. It is estimated that in 1980 over 400 persons were killed in Minnesota because of drunken drivers and direct economic loss amounted to approximately $114 million.
>
> * * *
>
> As the statistics cited above point out, drunken drivers pose a severe threat to the health and safety of the citizens of Minnesota.

*Id.* at 62–63. The court concluded that the State's interest in highway safety was "compelling." *Id.* at 63. The statistics in *Heddan* justify the conclusion that the effects of drunk driving are grave and the public interest served by the checkpoint is great. *See also Stark v. Perpich,* 590 F.Supp. at 1060 (the problem of drunk driving is unquestionably a legitimate and important concern of the State).

The second element of the *Brown* test, the degree to which the seizure advances the public concern involved, was also examined in *Delaware v. Prouse.* In *Prouse,* the court questioned whether

> the discretionary spot check is a *sufficiently productive mechanism* to justify the intrusion upon Fourth Amendment interests which such stops entail. On the record before us, that question must be answered in the negative. Given the alternative mechanisms available, both those in use and those that might be adopted, we are unconvinced that the incremental contribution to highway safety of the random spot check justifies the practice under the Fourth Amendment.
>
> The foremost method of enforcing traffic and vehicle safety regulations, it must be recalled, is acting upon observed violations. Vehicle stops for traffic violations occur countless times each day; and on these occasions, licenses and registration papers are subject to inspection and drivers without them will be ascertained. Furthermore, drivers without licenses are presumably the less safe drivers whose propensities may well exhibit themselves. *Absent some empirical data to the contrary,* it must be assumed that finding an unlicensed driver among those who commit traffic violations is a much more likely event than finding an unlicensed driver by choosing randomly from the entire universe of drivers. * * * In terms of actually dis-

vandalism unconstitutional. *See State v. Hilleshiem,* 291 N.W.2d 314 (Iowa 1980).

Other courts have upheld DWI checkpoints of widely varying characteristics: *State v. Superior Court,* 143 Ariz. 45, 691 P.2d 1073 (1984); *State v. Golden,* 171 Ga.App. 27, 318 S.E.2d 693 (1984); *State v. Deskins,* 234 Kan. 529, 673 P.2d 1174 (1983); *Kinslow v. Commonwealth,* 660 S.W.2d 677 (Ky.Ct.App.1983); *Little v. State,* 300 Md. 485, 479 A.2d 903 (1984); *People v. Scott,* 63 N.Y.2d 518, 473 N.E.2d 1, 483 N.Y.S.2d 649 (1984); *State v. Goines,* 16 Ohio App.3d 168, 474

N.E.2d 1219 (1984). Some courts hold license checkpoints constitutional, but DWI checkpoints unconstitutional: *Compare People v. Bartley,* 125 Ill.App.3d 575, 80 Ill.Dec. 894, 466 N.E.2d 346, *with People v. Long,* 124 Ill.App.3d 1030, 80 Ill.Dec. 332, 465 N.E.2d 123 (1984); *State v. Cloukey,* 486 A.2d 143 (Me.1985).

Lower federal courts have also addressed the issue: *United States v. Prichard,* 645 F.2d 854 (10th Cir.1981); *Stark v. Perpich,* 590 F.Supp. 1057 (D.Minn.1984) (MacLaughlin, J.).

covering unlicensed drivers or deterring them from driving, the spot check does not appear sufficiently productive to qualify as a reasonable law enforcement practice under the Fourth Amendment.

*Prouse,* 440 U.S. at 659–60, 99 S.Ct. at 1399 (emphasis added, footnotes omitted). "Thus, the Court [in *Prouse*] required some evidence that the law enforcement practice in question actually promoted the government interest asserted to justify the intrusion * * * to a greater degree than other law enforcement practices based on individualized suspicion." *State v. McLaughlin,* 471 N.E.2d at 1133.

The case law is not uniform in holding what evidence is required to show the seizure advanced the public interest. Some courts require the state to demonstrate that DWI checkpoints are a more effective and productive mechanism in apprehending drunk drivers than the other available, less intrusive methods based on individualized suspicion. *See McLaughlin,* 471 N.E.2d at 1137 n. 7; *Jones v. State,* 459 So.2d at 1079; *State ex rel. Ekstrom v. Justice Court,* 136 Ariz. at 5, 663 P.2d at 996. 'Other courts, however, require only that the state produce evidence that DWI checkpoints were effective in reducing alcohol-related automobile accidents and injuries. *See People v. Scott,* 63 N.Y.2d at 528–29, 473 N.E.2d at 5–6, 483 N.Y.S.2d at 653–54; *Little v. State,* 300 Md. at 505–06, 479 A.2d at 913; *State v. Superior Court,* 143 Ariz. at 48–49, 691 P.2d at 1076–77. Despite this apparent conflict,[2] it is clear that most courts have required the state to produce *some evidence* that the checkpoints advanced the public interest in combatting the problems of drunk driving.

Finally, we examine the severity of the interference with individual liberty result-

ing from the seizure. The primary concern here has been

to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field. *See Delaware v. Prouse,* 440 U.S. 648, 654–655 [99 S.Ct. 1391, 1396–1397, 59 L.Ed.2d 660] (1979); *United States v. Brignoni-Ponce, supra,* 422 U.S. [873] at 882 [95 S.Ct. 2574, 2580, 45 L.Ed.2d 607]. To this end, the Fourth Amendment requires that a seizure must be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers.

*Brown v. Texas,* 443 U.S. at 51, 99 S.Ct. at 2640.

In evaluating the sufficiency of a DWI checkpoint plan "embodying explicit neutral limitations on the conduct of individual officers," most courts have focused on at least three criteria: (1) whether the checkpoint location was chosen by supervisory officials and not officers in the field (*see Martinez-Fuerte,* 428 U.S. at 559, 96 S.Ct. at 3083; *Jones,* 459 So.2d at 1079; *Deskins,* 234 Kan. at 541–42, 673 P.2d at 1185; *McGeoghegan,* 389 Mass. at ——, 449 N.E.2d at 353; *Hilleshiem,* 291 N.W.2d at 318); (2) whether the location was rationally selected for the purpose of the checkpoint, for instance, selecting a site based on empirical data showing that drunk drivers pose a particular danger at the particular location (*see Kirk,* 202 N.J.Super. at 55, 493 A.2d at 1286; *McLaughlin,* 471 N.E.2d at 1137; *Deskins,* 234 Kan. at 541–42, 673 P.2d at 1185); and (3) whether the field officers were specifically instructed whom

---

**2.** We note that the disparate evidentiary requirements may stem from the operation of the particular checkpoint. Courts that have required a showing that checkpoints are more productive apprehension mechanisms than methods involving individualized suspicion have been faced with checkpoint operations which gave no advance notice to the public through the use of media publicity. Such checkpoints are clearly

designed to apprehend, not deter. On the other hand, courts that have only required evidence of a decline in alcohol-related accidents as a result of the checkpoints have been faced with checkpoint operations which included extensive media publicity warning the public of the checkpoint. These checkpoints have a much stronger deterrent characteristic, which may justify the lower evidentiary burden.

to stop, what to say, and what to look for (*see Little*, 300 Md. at 506, 479 A.2d at 913). Courts have favorably viewed checkpoint plans based on detailed written instructions. *See Stark v. Perpich*, 590 F.Supp. at 1060; *McLaughlin*, 471 N.E.2d at 1141 n. 8; *State v. Superior Court*, 143 Ariz. at 47, 691 P.2d at 1075.

In addition to these criteria, which are generally for the purpose of requiring that individuals not be subjected to the unbridled discretion of field officers, the cases also provide that the safety of motorists must be assured through the use of proper lighting and site selection (*see Hilleshiem*, 291 N.W.2d at 318; *Jones*, 459 So.2d at 1079) and that the degree of intrusion and the length of the detention be minimized by specific instructions to officers and a sufficient number of officers to handle the traffic (*see Martinez-Fuerte*, 428 U.S. at 558, 96 S.Ct. at 3083; *Little*, 300 Md. at 506, 479 A.2d at 913–14; *Jones*, 459 So.2d at 1079; *McGeoghegan*, 389 Mass. at ——, 449 N.E.2d at 353).

■ The presence of signs warning of the impending stop and advance publicity on the operation of the checkpoints are recognized as beneficial in reducing the concern and anxiety of motorists.[3] While most courts do not hold it constitutionally required, these factors have generally been present in the most recent cases upholding a checkpoint as constitutional.[4] *See Scott; Little; State v. Superior Court.*

Finally, we note that if law enforcement authorities of our various state municipalities could freely operate simultaneous checkpoints, the end result would be an extraordinary inconvenience "for innocent motorists to encounter perhaps even multiple times in the course of a drive[.] We * * could not accept this as a way of life in our constitutional democracy." *Jones*, 459 So.2d at 1080.

■ In applying these criteria to the facts before us, we conclude that the State did not meet its burden of proving the reasonableness of this warrantless seizure. *See State ex rel. Rasmussen v. Tahash*, 272 Minn. 539, 554, 141 N.W.2d 3, 13–14 (1965). The State failed to produce any evidence which demonstrated either the need for the more intrusive method or the superiority of checkpoints to the less intrusive alternative method of apprehension based on individualized suspicion.

There was also little evidence of any attempt to minimize the concern and fear generated in motorists as a result of the checkpoint. There were no warning signs explaining the roadblock to motorists. There was no advance publicity. There was insufficient evidence that the roadblock site was rationally selected. There was no detailed administrative plan, written or otherwise, instructing officers what to do or say to motorists.

As the Indiana Court of Appeals noted in *McLaughlin:*

> Recognizing that the roadblock procedure here at issue, in which the culpable and innocent alike were subject to seizure by law enforcement agents, lies at the very fringe of the fourth amendment, we are unwilling to validate this procedure absent some evidence that it is necessary, or at least more effective than available methods of drunk driving law enforcement, which are based on individualized suspicion aroused by observed conduct. Therefore, we hold that the state failed to meet its burden of proving the reasonableness of the warrantless seizure of defendant under the fourth amendment standard announced by the United States Supreme Court in *Brown*

---

3. The State argues the trial court's finding of no advance warning to approaching motorists of the checkpoint is clearly erroneous. Chief Dickinson was the only witness who testified on the physical layout, and he testified only to the presence of a city vehicle with a caution light. There was no testimony that motorists were warned of the *purpose* of the upcoming check-

point. The trial court's finding was not clearly erroneous.

4. While not required, the presence of advance publicity may affect the State's burden of production on the issue of whether the checkpoint advanced the public interest. *See supra* note 2.

*v. Texas, supra,* and so, we affirm the trial court's ruling that the fruits of that seizure must be suppressed.

*Id.,* 471 N.E.2d at 1141–42 (footnote omitted).

## DECISION

The State failed to demonstrate that a warrantless seizure resulting from a DWI checkpoint was reasonable. The seizure therefore violated the fourth amendment, and any evidence gathered as a result of the stop must be suppressed.

Affirmed.