Ricky Francis ASCHER, Petitioner, Appellant,

v.

**COMMISSIONER OF PUBLIC SAFETY, Respondent.**

No. C3–93–364.

Court of Appeals of Minnesota.

Aug. 31, 1993.

Review Granted Oct. 28, 1993.

Faison T. Sessoms, Jr., Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Joseph Plumer, Jeffrey S. Bilcik, Asst. Attys. Gen., St. Paul, for respondent.

Considered and decided by PARKER, P.J., and LANSING and THOREEN,* JJ.

## OPINION

PARKER, Judge

Appellant Ricky Ascher argues that Fourth Amendment violations occurred when he was stopped at a sobriety checkpoint where television media were invited and present. He also argues that sobriety checkpoints violate article I, section 10, of the Minnesota Constitution. We reverse.

## FACTS

On August 14–15, 1992, the Burnsville Police Department, the Dakota County Sheriff's Department, and the Minnesota State Patrol conducted a sobriety checkpoint on Highway 13 at Nicollet Avenue in the City of Burnsville, Minnesota.

All vehicles traveling westbound on Highway 13 and northbound on Nicollet Avenue were diverted into the pre-screening area. Those drivers displaying signs of possible intoxication were directed into the final screening area to perform field sobriety tests. The other drivers were permitted to leave the testing site. The officers checked 975 vehicles between 10 p.m. and 2 a.m. and made 14 DWI arrests.

The media was invited to attend the sobriety checkpoint, and two local television stations sent camera crews to film the event. As long as they did not interfere with the police, the crews were free to film all areas of the checkpoint. The extent of the media's

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by ap-

pointment pursuant to Minn. Const. art. VI, § 10.

presence is evidenced by this excerpt from the testimony of Jay Swanson, a lieutenant with the Minnesota State Patrol.

Q: Now, did you contact the local TV stations in this case?

A: Yes, we did. Every television station in the Twin Cities area was contacted.

\* \* \* \* \* \*

Q: And the television crews that showed up, they had their cameras and they had their lights and they did some filming at the roadblock, did they not?

A: Yes, they did.

Q: You didn't restrict what the television crews could shoot, did you?

A: No, sir, I didn't.

\* \* \* \* \* \*

Q: Now, the TV film crews, they were free to film the people driving through the checkpoint, is that right?

A: Yes, sir.

Q: And they were also free to film the drivers that were diverted to the final screening area, correct?

A: Yes, sir.

Q: So they were free to film the people that were being tested for their state of sobriety?

A: Yes, sir.

Q: And they were free to film the drivers actually performing these field sobriety tests, correct?

A: Yes, sir.

Q: And the film crews were present at the checkpoint at your invitation, is that right?

A: Yes, sir.

Appellant Ricky Ascher arrived at the checkpoint and was diverted to the final screening area, where he failed several field sobriety tests. Ascher also failed the preliminary breath test. He was then brought back to the police station, where he refused to take the Intoxilyzer test. Ascher's driver's license was subsequently revoked pursu-

ant to Minn.Stat. § 169.123, subd. .4 (1992), the implied consent statute.

By petition for judicial review of the revocation, Ascher challenged the revocation on several grounds. After a hearing and briefing by the parties, the trial court sustained the revocation of Ascher's license in an order dated January 21, 1993. Appeal is from this order.[1]

## ISSUES

I. Was the sobriety checkpoint reasonable under *Michigan Dep't of State Police v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990)?

II. Does the sobriety checkpoint violate article I, § 10, of the Minnesota Constitution?

## DISCUSSION

### I

The United States Supreme Court addressed the constitutionality of seizures made pursuant to sobriety checkpoint roadblocks in *Michigan Dep't of State Police v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990). The Court held that a Fourth Amendment seizure occurs during such a stop. *Id.* at 448, 110 S.Ct. at 2485. In determining whether the seizure was reasonable, the Court did not require individualized suspicion that the specific driver was intoxicated. *Id.* at 456, 110 S.Ct. at 2488 (Brennan, J., dissenting). Instead, the Court used the balancing test set out in *Brown v. Texas,* 443 U.S. 47, 50–51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979):

[T]he reasonableness of seizures that are less intrusive than a traditional arrest \* \* \* depends " 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.' " \* \* \* Consideration of the constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizure,

---

1. This opinion is being released concurrent with *Gray v. Commissioner of Public Safety,* 505 N.W.2d 357 (Minn.App.1993), which concludes

that the subjective intrusion of a sobriety checkpoint in St. Paul was conducted under procedures reasonable under the federal Constitution.

the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.

### 1. *Gravity of Public Concern*

■ With respect to the gravity of public concern, the *Sitz* Court stated, "[n]o one can seriously dispute the magnitude of the drunken driving problem or the States' interest in eradicating it." 496 U.S. at 448–49, 110 S.Ct. at 2485. *See also State v. Muzik*, 379 N.W.2d 599, 602 (Minn.App.1985) ("effects of drunk driving are grave and the public interest served by the checkpoint is great"). Ascher does not challenge the serious nature of the drunk driving problem or the state's interest in eradicating it. We conclude the first prong of the *Brown* test is satisfied.

### 2. *Degree to which the Seizure Advances the Public Interest*

The second prong of the *Brown* test requires that the seizure reasonably advance the public's interest. *Id.; Brown*, 443 U.S. at 50–51, 99 S.Ct. at 2640. The Supreme Court in *Sitz* rejected the searching examination of the "effectiveness" of the roadblock undertaken by the lower court:

> The actual language from *Brown v. Texas*, upon which the Michigan courts based their evaluation of "effectiveness," describes the balancing factor as "the degree to which the seizure advances the public interest." 443 U.S. at 51, 99 S.Ct. at 2640. This passage from *Brown* was not meant to transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger. Experts in police science might disagree over which of several methods of apprehending drunken drivers is preferable as an ideal. But for purposes of Fourth Amendment analysis, the choice among such reasonable alternatives remains with the governmental officials who have a unique understanding of, and a

responsibility for, limited public resources, including a finite number of police officers.

496 U.S. at 453–54, 110 S.Ct. at 2487.

■ Thus, under *Sitz*, there need only be a demonstration that the roadblock provided a reasonable method of dealing with drunk driving. *Id.* In this case, testimony at the hearing indicated that the location was chosen because of the high incidence of DWI violations and traffic accidents in the area and because the site was well suited for the checkpoint. The DWI arrests at this checkpoint were about 1.4 percent, approximately the same as in *Sitz*. *Id.* at 455, 110 S.Ct. at 2487. Under *Sitz*, this evidence is sufficient, for federal constitutional purposes, to establish that the sobriety checkpoint is a reasonable method of dealing with drunk driving and therefore reasonably advances the public interest.

### 3. *Interference with Appellant's Liberty Interests*

■ The third prong of the *Brown* test requires an examination of the severity of the intrusion on the law-abiding motorist. *Sitz*, 496 U.S. at 452, 110 S.Ct. at 2486; *Chock v. Commissioner of Pub. Safety*, 458 N.W.2d 692, 693–94 (Minn.App.1990).

The Court, in *Sitz*, held the objective measure of intrusion on motorists at a sobriety checkpoint, as gauged by the duration of the seizure and intensity of the investigation, to be minimal. 496 U.S. at 452, 110 S.Ct. at 2486. In this case, Lieutenant Swanson testified that the delay to the average driver between entering and leaving the pre-screening site was between one and three minutes. In addition, the inquiry only allowed the officers to ask each driver for a driver's license and detect whether the driver showed signs of alcohol consumption. It is undisputed that the objective intrusion was minimal.

The subjective intrusion factor measures the potential for a sobriety checkpoint generating fear and surprise in the law-abiding motorist, rather than in a driver who has been drinking. *Id.* We are concerned, however, with the extent of that subjective intrusion.

We conclude the Burnsville sobriety checkpoint impermissibly exacerbated the subjective intrusion to the law-abiding motorist. As recited in the statement of facts, law enforcement officers invited the media to visit the sobriety checkpoint. The record is devoid of evidence that law enforcement officers made any effort to protect the privacy rights of individuals from the invasive methods of the media. Television cameras were allowed to film all areas of the checkpoint, including the pre-screening area and the final screening area, where some drivers were required to get out of their vehicles and perform field sobriety tests. In fact, television cameras were allowed to film people performing field sobriety tests. Drivers who may not have been legally intoxicated were subjected to the very real fear that their photo would appear on the evening news. We believe these factors render the subjective intrusion constitutionally unreasonable.

There are many reasons why the media's presence could generate fear and surprise in a law-abiding motorist. Many people believe that the contents and occupants of a motor vehicle are private concerns, and they do not expect to be videotaped for general media use as they drive on the highway. They do not anticipate this heightened level of public scrutiny when stopped and asked questions by police or when asked by police to step outside their vehicles. Approaching a sobriety checkpoint where television cameras are free to photograph without restraint may cause anxiety in those who legitimately expect privacy. In addition, those with physical impairments or poor motor skills may experience greater fear if they anticipate performing field sobriety tests in front of television cameras.

We conclude that law enforcement officers, by inviting the media to the checkpoint without limiting their access to film people, or

without taking any steps to protect the privacy of law-abiding citizens, grossly magnified the subjective intrusion experienced by those passing through the checkpoint. Accordingly, under the United States Supreme Court's decision in *Sitz*, we hold the Burnsville sobriety checkpoint to have been constitutionally invalid. Although we recognize that citizens who appear to have violated laws may have a lessened right to privacy, there is a degradation of public spirit and human dignity when a police force uses unrestricted media exploitation as a serious method of law enforcement, particularly when so few people are actually apprehended as violators.

Ascher also argues the roadblock was flawed because no politically accountable officials were involved. Because we determine the subjective intrusion to have been constitutionally excessive, we need not reach this issue.

## II

Ascher next argues that sobriety checkpoints violate article I, section 10, of the Minnesota Constitution. Although we have already determined the Burnsville checkpoint violated the federal Constitution under *Sitz*, we examine, alternatively, the propriety of the checkpoint under the Minnesota Constitution as an adequate and independent state ground for decision. *See Michigan v. Long*, 463 U.S. 1032, 1041, 103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201 (1983) (noting that state courts should be left free to interpret state constitutions). While the Fourth Amendment to the federal Constitution is almost identical to article I, section 10, of the Minnesota Constitution, the scope of protection each affords is not necessarily the same. A state court may interpret its state's constitution so as to offer greater protection of individual rights. *State v. Fuller*, 374 N.W.2d 722, 726 (Minn.1985).[2]

2. *See* Wisconsin Supreme Court Justice Shirley S. Abrahamson and Diane S. Gutman, *New Federalism: State Constitutions and State Courts* in *A Workable Government?*, 103, 104 (Burke Marshall ed. 1987). The authors summarize the development of the doctrine of New Federalism to its present state as follows:

For a long time, few people seemed aware that protection of individual liberties could lie in the state constitution—and not solely in the

U.S. Constitution. In the 1970s, state courts gradually reawakened to their legitimate authority to construe the rights that their state constitutions provided independently of the U.S. Supreme Court's construction of analogous rights in the federal Constitution. When a state court construes the state constitution in the same way that the U.S. Supreme Court construes the federal Constitution, or when a state court goes beyond the Supreme Court in

As the Minnesota Supreme Court put it in *Fuller:*

It is axiomatic that a state supreme court may interpret its own state constitution to offer greater protection of individual rights than does the federal constitution. Indeed, as the highest court of this state, we are " 'independently responsible for safeguarding the rights of [our] citizens.' " State courts are, and should be, the first line of defense for individual liberties within the federalist system. This, of course, does not mean that we will or should cavalierly construe our constitution more expansively than the United States Supreme Court has construed the federal constitution.

*Id.* at 726–27 (citations and footnote omitted).

In *Chock,* 458 N.W.2d at 693, a driver whose license was revoked pursuant to a sobriety checkpoint stop asked this court to find the roadblock invalid on independent state grounds. This court concluded, *"[a]t this time,* we choose to follow the United States Supreme Court's decision in *Sitz* and uphold the stop of appellant pursuant to the roadblock." *Id.* at 694 (emphasis supplied). A recent decision of the Minnesota Supreme Court, however, indicates there may be compelling reasons to depart from the United States Supreme Court's Fourth Amendment search and seizure analysis. *See In re Welfare of E.D.J.,* 502 N.W.2d 779 (1993) (rejecting United States Supreme Court's Fourth Amendment analysis in *California v. Hodari,* 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), and concluding, under the Minnesota

Constitution, that a seizure did take place). Accordingly, we do not believe *Chock* forecloses this court at *this* time from entertaining a Minnesota constitutional challenge to the Burnsville sobriety checkpoint.

While we agree with the *Sitz* Court that the balancing test enunciated in *Brown* provides an analytical framework to examine the constitutionality of sobriety checkpoints, we are troubled by the Court's application of *Brown* to sobriety checkpoints and believe *Sitz* departed substantially from well-established Fourth Amendment analysis. In particular, we are concerned with the Court's application of the second and third elements of the *Brown* analysis. Accordingly, we believe it necessary to weigh the *Brown* factors independently under the Minnesota Constitution.[3]

■ With respect to the second element, the degree to which the seizure advances the public interest, although this checkpoint would meet the standard of *Sitz,* we conclude there is insufficient evidence to demonstrate that it advances the public's interest under the Minnesota Constitution. In *Delaware v. Prouse,* 440 U.S. 648, 657, 99 S.Ct. 1391, 1398, 59 L.Ed.2d 660 (1979), the Court held that random driver's license and registration check stops of single automobiles violated the Fourth Amendment. The *Prouse* Court questioned whether the spot check is a sufficiently productive mechanism to justify the intrusion upon Fourth Amendment interests which such stops entail. *Id.* at 659, 99 S.Ct. at 1399. The Court concluded that absent

---

the protection of human rights, there is no inherent conflict between nation and state. Conflict does arise when state standards fall short of federal standards.

*Id.*

3. Abrahamson and Gutman analyze the various ways states apply federal precedent in interpreting identical state constitutional language:

The twin contending principles of national supremacy and state autonomy have played out differently in different state courts. Some state courts have given conclusive weight to federal precedent, apparently adopting in perpetuity all existing or future U.S. Supreme Court interpretations of the federal constitutional provision as the governing interpretation of the parallel state provision. Other courts

give great but not controlling weight to interpretations of a parallel federal provision. Still other courts treat U.S. Supreme Court opinions much as they would those of sister states or lower federal courts—as decisions deserving of whatever weight the reasoning and intellectual persuasiveness of the opinion warrants. Thus dissenting and concurring of U.S. Supreme Court justices take on a new significance, opening lines of communications between federal and state systems and thereby promoting the dialogue that is a central virtue of federalism.

Abrahamson, *supra* note 2 at 131.

It appears that the Minnesota Supreme Court has chosen the second course and gives federal precedent great but not controlling weight. *See In re Welfare of E.D.J.,* 502 N.W.2d 779 (Minn. 1993); *Fuller,* 374 N.W.2d at 727.

empirical data to the contrary, the spot check does not appear sufficiently productive to qualify as a reasonable law enforcement practice under the Fourth Amendment. *Id.* Likewise, in a pre-*Sitz* case, this court concluded the *Brown* test was not satisfied if the state failed to produce any evidence demonstrating either the need for the more intrusive checkpoint method or the superiority of checkpoints to less intrusive methods. *Muzik*, 379 N.W.2d at 603–04.

Similarly, because the state failed to produce any empirical data demonstrating sobriety checkpoint arrests represent an increase over the number of arrests that would have been made using conventional law enforcement methods or demonstrated a need for the more intrusive checkpoint method, we believe the second element of the *Brown* balancing test is not satisfied.

As Mr. Justice Stevens pointed out in *Sitz,* the majority's analysis "resembles a business decision that measures profits by counting gross receipts and ignoring expenses." *Sitz,* 496 U.S. at 473, 110 S.Ct. at 2495 (Stevens, J., dissenting). We find Justice Stevens' observation particularly persuasive in this case. The evidence indicates the Burnsville checkpoint resulted in the arrest of approximately 1.4 percent of the drivers stopped. There is a complete absence of evidence that this figure represents an increase over the number of arrests that would have been made had the same law enforcement personnel been used in conventional patrols. Thus, although the *gross* number of arrests is positive, there is a complete failure of proof on the question of whether the wholesale seizures have produced any *net* advance in arresting drunk drivers. We therefore conclude, under the Minnesota Constitution, there is insufficient evidence indicating sobriety checkpoints advance the public interest.

We next examine the third element of the *Brown* test, the severity of the interference with individual liberty resulting from the seizure. In *State v. Gray,* 413 N.W.2d 107, 111 (Minn.1987), the Minnesota Supreme Court first explicitly recognized the existence of "a right of privacy guaranteed under and protected by the Minnesota Bill of Rights."

The court articulated the scope of protection afforded by that right as the protection only of fundamental rights, and explained:

Fundamental rights are "[t]hose which have their origin in the express terms of the Constitution or which are necessarily to be implied from those terms." Black's Law Dictionary 607 (Rev. 5th ed. 1979).

In deciding whether a right alleged to be fundamental is indeed fundamental, under our Constitution, we are not limited by United States Supreme Court decisions. * * *

Furthermore, we have not limited our finding of fundamental rights to those expressly stated in our constitution; this, of course, is consistent with the definition of fundamental rights.

*Gray,* 413 N.W.2d at 111. In that case the court declined to decide "whether the freedom of intimate association is constitutionally protected under the first amendment or as an intrinsic element of personal liberty" (*id.* at 113) and, on the particular facts before it, held no fundamental right to be involved. *Id.*

Three years later, however, the court held the right of privacy "begins with protecting the integrity of one's own body and includes the right not to have it altered or invaded without consent" in *Jarvis v. Levine,* 418 N.W.2d 139, 148 (Minn.1988), and specifically referenced Minn. Const. art. I, §§ 1, 2, and 10. The court there found the involuntary application of narcoleptic medication to a mentally ill patient required that right of privacy to be applied to the "protection of bodily integrity" as a fundamental right. *Id.* at 149. Concluding that the procedures in place limiting a doctor's discretion to treat a patient forcibly were "commendable in form * * * [but] meaningless in substance unless further procedural protections are required," the court held "[t]he serious invasion of personal autonomy which results should be ordered by a court rather than a doctor." *Id.* at 149.

The unfettered discretion afforded police officers and officials by the checkpoint procedures used here appears to have produced an intrusion on the privacy rights of law-abiding drivers, as well as the culpable, analogous to

the impermissible invasion of bodily integrity identified in *Jarvis*. Requiring drivers, under the lights and lenses of deliberately invited commercial television cameras, to get out of their cars and perform sobriety tests produced, here, a serious invasion of personal autonomy.

While we are acutely aware of the devastation caused by drunk drivers in our society, we believe *Sitz* "appears to give no weight to the citizen's interest in freedom from suspicionless unannounced investigatory seizures." *Sitz*, 496 U.S. at 473, 110 S.Ct. at 2497 (Stevens, J., dissenting).

■ The prospect that anyone, no matter how innocent, may be stopped for a televised police inspection is inconsistent with the Minnesota conception of ordered liberty. Sobriety checkpoints, we conclude, deny the detained individual's reasonable expectations of privacy, inserting a suspicionless search into a context where none would normally occur. While some may argue the intrusion is minimal, we are mindful of Mr. Justice Jackson's admonition:

These [Fourth Amendment rights], I protest, are not mere second-class rights but belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government. *Brinegar v. United States*, 338 U.S. 160, 180 69 S.Ct. 1302, 1313 [93 L.Ed. 1879] (1949) (Jackson, J., dissenting).

We are also concerned that law enforcement officials are using sobriety checkpoints as publicity exercises. Testimony at the hearing indicated law enforcement officials frequently invite the television media to attend sobriety checkpoints. Such a practice is reminiscent of the use of the stocks in colonial times to ridicule and make spectacles of those citizens who have offended community standards of behavior. We are concerned the state may justify its use of sobriety checkpoints on the basis that such checkpoints symbolize the public's interest in "getting tough on drunk drivers." To the extent

symbolism factors into the calculation of whether to conduct sobriety checkpoints, we commend to the state the words of Mr. Justice Scalia:

What better way to show that the Government is serious about its 'war on drugs' than to subject its employees on the front line of that war to this invasion of their privacy and affront to their dignity? To be sure, there is only a slight chance that it will prevent some serious public harm resulting from Service employee drug use, but it will show to the world that the Service is 'clean,' and—most important of all—will demonstrate the determination of the Government to eliminate this scourge of our society! I think it obvious that this justification is unacceptable; that the impairment of individual liberties cannot be the means of making a point; that symbolism, even symbolism for so worthy a cause as the abolition of unlawful drugs, cannot validate an otherwise unreasonable search. *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 686–87, 109 S.Ct. 1384, 1402 [103 L.Ed.2d 685] (1989) (Scalia, J., dissenting).

Even in circumstances as grave and tragic as those that accompany drunken driving, we cannot abdicate our responsibility to protect "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Minnesota Constitution art. I, § 10. Because the Commissioner failed to produce empirical evidence that sobriety checkpoints advance the public interest, we hold such wholesale, suspicionless, and potentially televised seizures, designed to search for evidence of intoxication, violate article I, section 10, of the Minnesota Constitution.

## DECISION

We conclude that law enforcement officers, by inviting the media to the checkpoint without taking any steps to protect the privacy of law-abiding citizens, grossly magnified the subjective intrusion experienced by those passing through the checkpoint. Accordingly, under the United States Supreme Court's decision in *Sitz*, we hold the Burnsville sobri-

ety checkpoint to have been invalid under the federal Constitution.

Alternatively, we hold that, absent empirical evidence that sobriety checkpoints advance the public interest, such wholesale, suspicionless seizures violate article I, section 10, of the Minnesota Constitution.

**Reversed and revocation of license ordered rescinded.**

THOREEN, Judge (dissenting).

I respectfully dissent.

In *Michigan Dep't of State Police v. Sitz,* 496 U.S. 444, 448–49, 110 S.Ct. 2481, 2485, 110 L.Ed.2d 412 (1990), the Supreme Court set out standards for determining the constitutionality of a sobriety checkpoint. In *Chock v. Commissioner of Pub. Safety,* 458 N.W.2d 692, 693–94 (Minn.App.1990), this court clearly adopted and followed *Sitz. See also State v. Larson,* 485 N.W.2d 571, 572–73 (Minn.App.1992) (applying *Sitz). Chock* rejected an argument that this court should use independent state grounds to provide greater protection of rights than the Supreme Court did in *Sitz. Chock,* 458 N.W.2d at 694.

The sobriety checkpoint at issue here was valid under the standards set forth in *Sitz,* 496 U.S. at 448–49, 110 S.Ct. at 2485, and *Chock,* 458 N.W.2d at 693–94. The presence of the media should not engender additional fear or surprise in a law-abiding citizen to the extent that the "subjective" intrusion becomes unconstitutional as a violation of the Fourth Amendment. *See Sitz,* 496 U.S. at 452–53, 110 S.Ct. at 2486–87 (discussion of subjective intrusion); *Chock,* 458 N.W.2d at 694 (same). As appellant makes no claim that he was photographed or filmed, no personal right of privacy was violated.

I would affirm the trial court under *Sitz* and *Chock.*