**John L. GRAY, Petitioner, Appellant (C6–93–262),**

**Sherry Jo Gray, Petitioner, Appellant (CX–93–264),**

v.

**COMMISSIONER OF PUBLIC SAFETY, Respondent.**

**Nos. C6–93–262, CX–93–264.**

Court of Appeals of Minnesota.

Aug. 31, 1993.

Review Granted Oct. 28, 1993.

Faison T. Sessoms, Jr., Minneapolis, for appellants in (C6–93–262) and (CX–93–264).

Hubert H. Humphrey, III, Atty. Gen., Roberta Cordano, Asst. Atty. Gen., St. Paul, for respondent.

Considered and decided by ANDERSON, C.J., and PETERSON and FLEMING,[*] JJ.

## OPINION

ANDERSON, Chief Judge.

Appellants John L. Gray and Sherry Jo Gray, who were driving separate vehicles,

[*] Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

were stopped at a sobriety checkpoint. Their drivers' licenses were revoked pursuant to the implied consent law. They filed separate appeals, which this court consolidated. We affirm.

## FACTS

This case involves a challenge to a sobriety checkpoint conducted in St. Paul that began at 10:00 p.m. on September 18, 1992, and continued until 2:00 a.m. the next day. Two months before, Captain Al Singer of the St. Paul Police Department and Deputy Tom LaBathe of the Ramsey County Sheriff's Department approached Lieutenant Michael Haines of the Minnesota State Patrol to plan a joint-agency sobriety checkpoint. The three officers discussed site selection, traffic safety, and personnel organization in accordance with Minnesota State Patrol written guidelines.

The officers selected an area on Arcade Street, in the vicinity of Clear and Ivy Streets, because it was centrally located and had a high number of DWI violations and traffic accidents. The area was also well-suited for the safe operation of a checkpoint. The St. Paul Police Department notified the media of the checkpoint in advance, but did not advise the media of the checkpoint's exact location until just before it was set up.

Captain Singer briefed the 26 to 30 "sworn" officers and an equal number of reserve officers about their roles and police procedures. Signs notified approaching drivers of the checkpoint, cones diverted traffic into the screening area, and reserve officers directed traffic. Marked squad cars were present.

After the drivers entered the prescreening area, regular officers asked for drivers' licenses and screened for indications of alcohol use or other problems related to driving abilities. If the officer detected any signs of intoxication or the driver could not produce a driver's license, he or she was directed to the final screening area. Otherwise, they were allowed to leave.

At least two local television stations were present at the checkpoint, and a third may have been there briefly. The media and spectators were restricted to an area behind a rail on a raised portion of the parking lot near the final screening area, and some camera crews filmed cars as they entered the prescreening area. The media were permitted to film different checkpoint areas if they did not violate "somebody's right to privacy" or interfere with police procedures. Spectators observed as well.

The police checked 716 vehicles. Eighty-one citations were issued, along with 15 written warnings, for a total of 96 violations. Out of these citations and warnings, there were 9 open-bottle violations and 21 DWI arrests. The DWI arrests accounted for 2.93% of the drivers who entered the checkpoint. Lieutenant Haines testified that the sobriety checkpoint was "one of the most productive ones that we have conducted." The longest recorded delay to any driver in the prescreening area was 3 minutes and 50 seconds. The shortest delay was 30 seconds. Lieutenant Haines estimated that the average delay was approximately one minute.

John L. Gray and Sherry Jo Gray drove separate vehicles into the sobriety checkpoint. They were directed to the final screening area after a preliminary determination that each of them was under the influence. Both were subsequently placed under arrest for DWI. John L. Gray refused to take an Intoxilyzer test. Sherry Jo Gray took an Intoxilyzer test that resulted in an alcohol concentration of .14. Their licenses were revoked, and they challenged the revocation at implied consent hearings.

The trial court issued an extensive memorandum discussing the challenges to the checkpoint and sustained the license revocations. John L. Gray and Sherry Jo Gray appeal, and we affirm.

## ISSUES

I. Was the sobriety checkpoint reasonable under the Fourth Amendment to the United States Constitution?

II. Should Minn. Const. art. I, § 10 be interpreted more expansively than the Fourth Amendment, so as to hold the checkpoint unconstitutional?

## ANALYSIS

### I.

■ A seizure under the Fourth Amendment occurs during a stop made pursuant to a sobriety checkpoint. *Michigan Dep't of State Police v. Sitz,* 496 U.S. 444, 450, 110 S.Ct. 2481, 2485, 110 L.Ed.2d 412 (1990). In determining whether the seizure is reasonable, the *Sitz* court embraced the three-pronged balancing test from *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979):

> [T]he reasonableness of seizures that are less intrusive than a traditional arrest * * * depends " 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.' " * * * Consideration of the constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.

*Id.* at 50–51, 99 S.Ct. at 2640 (citations omitted).

■ Hence, this court must weigh the state's interest in preventing drunk driving, the extent to which the system reasonably advances that interest, and the degree of intrusion upon individual motorists. *See Sitz,* 496 U.S. at 455, 110 S.Ct. at 2488; *State v. Larson,* 485 N.W.2d 571, 573 (Minn.App. 1992) (applying *Sitz* and holding checkpoint unconstitutional); *Chock v. Commissioner of Pub. Safety,* 458 N.W.2d 692, 694 (Minn.App. 1990) (applying *Sitz* and holding checkpoint constitutional).

### A. *Gravity of public concern*

■ The first prong requires weighing the gravity of public concern served by the seizure. The United States Supreme Court stated "[n]o one can seriously dispute the magnitude of the drunken driving problem or the States' interest in eradicating it." *Sitz,* 496 U.S. at 451, 110 S.Ct. at 2485. In *Szczech v. Commissioner of Pub. Safety,* 343 N.W.2d 305, 306 (Minn.App.1984), this court stated "[t]he trail of broken lives, bodies, and property left by drunk drivers is a holocaust

on our highways." It is undisputed that the gravity of public concern is great and weighs strongly in favor of the checkpoint's constitutionality.

### B. *Advancement of public interest*

■ The second prong requires the seizure reasonably advance the public's interest. *Sitz,* 496 U.S. at 453, 110 S.Ct. at 2487. Appellants do not dispute that the roadblock provided a reasonable method of dealing with drunk driving. The location was chosen both because of the area's high incidence of DWI violations and traffic accidents and because it was well-suited for the checkpoint. The percentage of stopped motorists who were arrested for DWI, here 2.93%, was higher than the 1.5% arrested in *Sitz. Id.* at 455, 110 S.Ct. at 2487 (public officials need not show the sobriety checkpoint is the most effective method of apprehending drunk drivers, but that the method employed provides a "reasonable alternative" for dealing with the public danger).

Appellants, however, contend the roadblock was flawed because no politically accountable officials were involved. In *Sitz,* the Court noted that an inquiry into the degree to which the seizure advances the public interest

> was not meant to transfer from politically accountable officials to the courts the decision as to which among reasonable law enforcement techniques should be employed to deal with a serious public danger.

*Id.* at 453, 110 S.Ct. at 2487. Instead, the choice among reasonable alternatives was meant to remain with the governmental officials "who have a unique understanding of, and a responsibility for, limited public resources, including a finite number of police officers." *Id.* In *Sitz,* the sobriety checkpoint was ordered by the governor and run by an advisory task force acting on his behalf. *Sitz v. Department of State Police,* 429 N.W.2d 180, 181 (Mich.Ct.App.1988); *see State v. Wagner,* 821 S.W.2d 288, 291 (Tex. Ct.App.1991) (holding checkpoint unconstitutional because no showing it arose from legislatively-developed administrative scheme as in *Sitz* ), *rev. refused* (Tex. Feb. 26, 1992).

While the law enforcement officials who planned and implemented this checkpoint were not elected, they are still answerable to elected officials and, consequently, to the public for their actions. Further, the Ramsey County Sheriff, an elected official, did approve this checkpoint. Appellants' argument is therefore unpersuasive, and we conclude *Sitz*'s second prong weighs heavily in favor of the checkpoint's constitutionality.

### C. *Interference with liberty interests*

■ The final prong requires an examination of the objective and subjective intrusion on the "law abiding motorist." *Sitz*, 496 U.S. at 452, 110 S.Ct. at 2486. The objective measure of intrusion on motorists is gauged by the seizure's duration and the investigation's intensity. *Sitz*, 496 U.S. at 452, 110 S.Ct. at 2486. In this case, the objective intrusion was minimal. The average delay to drivers between entering and leaving the prescreening site was one minute, and the scope of the inquiry was limited to asking for the driver's license and assessing whether the driver was under the influence of alcohol.

A more troublesome issue is whether the manner in which the police conducted the sobriety checkpoint amounted to excessive subjective intrusion. Subjective intrusion is measured by the fear and surprise generated in the law abiding motorist by the stop. *Id.* We hold the sobriety checkpoint in this case was not conducted in a manner that engendered excessive fear or surprise in a law abiding motorist. *See id.* at 452–53, 110 S.Ct. at 2486. The checkpoint location was chosen by three supervising police officers, and it was well-lit and well-marked. As mentioned above, the seizure's duration and the investigation's intensity were minimized. *Cf. Larson*, 485 N.W.2d at 572 (roadblock that involved informal ad hoc driver's license checkpoint unconstitutional).

Appellants claim that by providing the media with notice, the police exacerbated both the checkpoint's "intensity and duration" and the "fear and surprise" a normally law abid-

ing motorist would experience. While we acknowledge the media's presence at this checkpoint may have heightened a motorist's anxiety, we do not believe their presence under the circumstances in this case amounted to an unconstitutional intrusion.

■ Notifying the media and allowing the media to be present and film does not grant police officers more discretion in conducting a checkpoint. In fact, the media's presence may restrict police discretion and safeguard against possible abuses of police power. Moreover, in a public arena such as this, the police had no basis for denying the media the right to observe and film the checkpoint, absent unreasonable or dangerous interference. *See United States v. Knotts*, 460 U.S. 276, 281–82, 103 S.Ct. 1081, 1085, 75 L.Ed.2d 55 (1983) (person traveling on public roads in automobile has no reasonable expectation of privacy in movements from one place to another).

■ Equally important, the media's presence in this would not invoke an unreasonable amount of fear or surprise in law abiding citizens. The "fear and surprise" inquiry relates only to the fear and surprise engendered by the nature of the stop to law abiding motorists, not to the fear and surprise engendered by the stop to those motorists who have been drinking. *Sitz*, 496 U.S. at 452, 110 S.Ct. at 2486. In particular, the trial court found the law enforcement officers took steps to protect the privacy of law abiding citizens. The media were not granted unlimited access to the checkpoint area, were primarily confined to the section overlooking the screening area, and were permitted to stay in the area only so long as they did not disturb the traffic flow. Under these circumstances, notification of the media did not make the checkpoint unconstitutional.[1]

## II.

Appellants argue that the sobriety checkpoint violates article I, section 10 of the Minnesota Constitution. They contend that

1. We note that a separate opinion, *Ascher v. Commissioner of Pub. Safety*, 505 N.W.2d 362 (Minn.App.1993), released concurrently with this one, concludes the subjective intrusion of a dif-

ferent sobriety checkpoint in Burnsville is unreasonable under both the federal and state constitutions.

**362**

in deciding this issue, this court should adopt the standard set out in *Camara v. Municipal Court,* 387 U.S. 523, 535, 87 S.Ct. 1727, 1734, 18 L.Ed.2d 930 (1967), as the minimum standard of reasonableness under Minn. Const. art. I, § 10 rather than applying *Sitz.* We disagree.

A state court may interpret its state's constitution to offer greater protection of individual rights than the federal constitution. *State v. Fuller,* 374 N.W.2d 722, 726 (Minn.1985). In construing Minn. Const. art. I, § 10, which contains language identical to the Fourth Amendment, we will not reject interpretations of the Fourth Amendment without sound reasons. *See In re E.D.J.,* 502 N.W.2d 779, 781 (Minn.1993). Sound reasons for interpreting a Minnesota state constitution provision different from its federal counterpart include Minnesota history or tradition warranting a different approach, *see State v. Sorenson,* 441 N.W.2d 455, 460 (Minn.1989) (Kelley, J., concurring specially), or compelling arguments in favor of departing from the federal approach, *see E.D.J.,* 502 N.W.2d at 781.

This court has already applied the standard set forth in *Sitz. See Larson,* 485 N.W.2d at 572–73; *Chock,* 458 N.W.2d at 693–94. We conclude there are no compelling reasons that require us to diverge from the Supreme Court's decision in *Sitz,* and instead follow the standards set out in *Camara* in determining the constitutionality of a sobriety checkpoint under the Minnesota Constitution.

### DECISION

The trial court properly held that the sobriety checkpoint did not violate appellants' state or federal constitutional rights.

**Affirmed.**