[No. S030479. Dec. 23, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
MARY LOUISE BANKS, Defendant and Appellant.

928

## COUNSEL

Ronald Y. Butler, Public Defender, Carl C. Holmes, Chief Deputy Public Defender, Thomas Havlena and Alan J. Crivaro, Deputy Public Defenders, for Defendent and Appellant.

Amitai Schwartz, Paul L. Hoffman, Alan L. Schlosser, Ann Brick, Edward M. Chen, Matthew A. Coles and Margaret C. Crosby as Amici Curiae on behalf of Defendant and Appellant.

Michael R. Capizzi, District Attorney, Maurice L. Evans, Chief Assistant District Attorney, Wallace J. Wade, Assistant District Attorney, Kathleen M. Harper, James F. Bacin and Gregory J. Robischon, Deputy District Attorneys, for Plaintiff and Respondent.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ronald E. Niver and Charles R. B. Kirk, Deputy Attorneys General, James K. Hahn, City Attorney (Los Angeles), Debbie Lew and Lisa S. Berger, Deputy City Attorneys, as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**GEORGE, J.**—In this case we decide whether advance publicity is a prerequisite to the operation of a constitutionally permissible highway "sobriety checkpoint."

In *Ingersoll* v. *Palmer* (1987) 43 Cal.3d 1321 [241 Cal.Rptr. 42, 743 P.2d 1299] (hereafter *Ingersoll*), this court upheld the constitutionality of sobriety checkpoints conducted pursuant to various safeguards, observing, in the course of our analysis, that advance publicity is one such safeguard "important to the maintenance of a constitutionally permissible sobriety checkpoint." (*Id.* at p. 1346.) In the present case, the Court of Appeal interpreted *Ingersoll* to require advance publicity as a *prerequisite* to the constitutional validity of a sobriety checkpoint. As we shall explain, however, the United States Supreme Court's analysis of the constitutionality of sobriety checkpoints in *Michigan State Police Dept.* v. *Sitz* (1990) 496 U.S. 444 [110 L.Ed.2d 412, 110 S.Ct. 2481] (hereafter *Sitz*), decided three years after our *Ingersoll* decision, establishes that advance publicity is not a constitutional prerequisite to the operation of such a checkpoint. Accordingly, we reverse the judgment of the Court of Appeal.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Defendant Mary Louise Banks was arrested for driving under the influence of alcohol on November 18, 1990, after being stopped at a sobriety checkpoint located on Pacific Coast Highway at the intersection of First Street in the City of Seal Beach. The checkpoint was operated by law enforcement officials of the Seal Beach, Cypress, La Palma, and Los Alamitos police departments.

A complaint thereafter was filed in municipal court charging defendant with violations of Vehicle Code former section 23152, subdivisions (a) and

(b), and other vehicular offenses.[1] Defendant entered a plea of not guilty and moved, pursuant to Penal Code section 1538.5, to suppress evidence (obtained at the sobriety checkpoint) establishing her alcohol-related impairment. Her motion, challenging the lawfulness of the sobriety checkpoint under the Fourth Amendment to the United States Constitution, maintained that the checkpoint did not conform to the guidelines set forth in *Ingersoll*.

At the hearing on the motion, the following evidence was adduced. The location of the sobriety checkpoint, on a heavily congested roadway, was chosen by supervisory law enforcement officials. The officers at the checkpoint were instructed to select the first four vehicles from every ten vehicles that approached the checkpoint between 10:10 p.m. and 12:15 a.m., and the first four vehicles from every six vehicles thereafter until 2:30 a.m., for the purpose of questioning the occupants. Prior to establishment of the checkpoint, the law enforcement officers operating it were briefed as to the manner in which the checkpoint was to be marked clearly and conspicuously. The officers used highway flares, cones, stop signs, overhead white lights, traffic barricades mounted with flashing lights, and a truck marked with arrows to identify the checkpoint and to divert motor vehicles safely away from the flow of traffic. Drivers approaching the checkpoint were confronted with a sign that read "Sobriety Checkpoint Ahead." Officers were instructed not to pursue motorists who turned their vehicles away before reaching the checkpoint. Numerous uniformed officers and marked police vehicles were visible at the checkpoint. Officers were instructed to detain approaching vehicles only for such time as was necessary to question the driver briefly and look for signs of intoxication. In the event such signs were found, the driver was asked to exit from his or her vehicle so that a law enforcement official could administer a field sobriety examination.

At the hearing, defendant testified that she did not observe highway flares, a flashing arrow, or a sign indicating the presence of a sobriety checkpoint, and that she drove through the checkpoint (until she was asked to stop, as she was exiting from it) because she believed someone was "making a movie." The municipal court found defendant's testimony regarding the warnings at the checkpoint to be less credible than that furnished by law enforcement officials.

---

[1] Vehicle Code former section 23152 provided in pertinent part: "(a) It is unlawful for any person who is under the influence of an alcoholic beverage or any drug, or under the combined influence of an alcoholic beverage and any drug, to drive a vehicle.

"(b) It is unlawful for any person who has 0.08 percent or more, by weight, of alcohol in his or her blood to drive a vehicle." The current version of the cited statutory language is virtually identical to that quoted here.

Although one of the police officers testified that he previously had participated in the operation of sobriety checkpoints, and that the establishment of these prior checkpoints had been preceded by publicity, the prosecution did not adduce any evidence specifically demonstrating that the establishment of this particular sobriety checkpoint was preceded by advance publicity.

At the conclusion of the hearing, the municipal court denied defendant's motion to suppress evidence, ruling that advance publicity was not a prerequisite to the constitutional validity of a sobriety checkpoint and that the checkpoint otherwise complied with the standards set forth in *Ingersoll*.

Following the municipal court's denial of her motion to suppress, defendant pled guilty, received a suspended sentence, and was placed on informal probation pending disposition of the present appeal.

In the appellate department of the superior court, defendant reiterated her contention that advance publicity was required in order to establish a constitutionally permissible sobriety checkpoint. Rather than decide the issue, the appellate department certified defendant's case to the Court of Appeal, which ordered transfer of the case. (Cal. Rules of Court, rules 62(a), 63(a).)[2] The Court of Appeal thereafter reversed the judgment of the municipal court, resting its decision on twin premises: (1) that under our decision in *Ingersoll*, advance publicity is a "requirement" of a constitutionally permissible sobriety checkpoint, and (2) because the United States Supreme Court, in *Sitz, supra,* 496 U.S. 444, upheld a sobriety checkpoint program that provided for advance publicity (and that otherwise was similar to the program discussed in *Ingersoll*), precheckpoint publicity is necessary if a checkpoint is to pass constitutional muster.

We granted the People's petition for review.[3]

---

[2]California Rules of Court, rule 62(a), provides in pertinent part: "A Court of Appeal may order a case transferred to it for hearing and decision when the superior court certifies or the Court of Appeal on its own motion determines . . . that such transfer appears necessary to secure uniformity of decision or to settle important questions of law."

Rule 63(a) provides in pertinent part: "The superior court on application of a party or on its own motion may certify that the transfer of a case to the Court of Appeal appears necessary to secure uniformity of decision or to settle important questions of law. . . ."

[3]The municipal court found that, but for the absence of advance publicity, the sobriety checkpoint in this case complied with the standards set forth in *Ingersoll*. The narrow question certified to, and addressed by, the Court of Appeal was whether advance publicity is a prerequisite to a constitutionally operated sobriety checkpoint. Accordingly, in this decision we limit our discussion to that issue and do not revisit the broader questions addressed in *Ingersoll* and *Sitz* pertaining to the constitutionality of sobriety checkpoints generally, and to

## II. Discussion

█ Pursuant to article I, section 28, of the California Constitution, a trial court may exclude evidence under Penal Code section 1538.5 only if exclusion is mandated by the federal Constitution. (*In re Lance W.* (1985) 37 Cal.3d 873, 896 [210 Cal.Rptr. 631, 694 P.2d 744].) Thus, exclusion of the evidence obtained at the sobriety checkpoint, supporting the charge that defendant was under the influence of alcohol while driving her vehicle, was proper only if that evidence was obtained in violation of the Fourth Amendment.

That amendment provides, in pertinent part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." (U.S. Const., Amend. IV.) █ State and local law enforcement officials are subject to the requirements of the Fourth Amendment based upon the operation of the due process clause of the Fourteenth Amendment to the United States Constitution. (*Mapp* v. *Ohio* (1961) 367 U.S. 643 [6 L.Ed.2d 1081, 81 S.Ct. 1684, 84 A.L.R.2d 933]; *Wolf* v. *Colorado* (1949) 338 U.S. 25, 27-28 [93 L.Ed. 1782, 1785-1786, 69 S.Ct. 1359].) █ The detention incident to the operation of sobriety "checkpoints" (which, for purposes of our analysis, we consider indistinguishable from sobriety "roadblocks") constitutes a "seizure" within the meaning of the Fourth Amendment. (*Sitz, supra,* 496 U.S. 444, 450 [110 L.Ed.2d 412, 420].) █ The purpose of the Fourth Amendment prohibition is to "safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." (*Camara* v. *Municipal Court* (1967) 387 U.S. 523, 528 [18 L.Ed.2d 930, 935, 87 S.Ct. 1727]; see also *Delaware* v. *Prouse* (1979) 440 U.S. 648, 653-654 [59 L.Ed.2d 660, 667-668, 99 S.Ct. 1391].) Thus, the narrow question presented in the present case is whether the detention involved in a sobriety checkpoint, established without advance publicity, constitutes a "reasonable" seizure and thus complies with the requirements of the Fourth Amendment.

█ The People contend this court's decision in *Ingersoll* does not require advance publicity, which we identified as one of eight *factors* to be examined in determining whether a sobriety checkpoint satisfies the reasonableness requirement of the Fourth Amendment. In the People's view,

---

the conflicting empirical evidence as to their effectiveness. (See, e.g., 4 LaFave, Search and Seizure: A Treatise on the Fourth Amendment (2d ed. 1987 & 1993 supp.) Vehicle Use Regulation, § 10.8(d), pp. 69-85 [examining sobriety checkpoints generally].) Furthermore, because the question presented in this case is limited to whether advance publicity is a *prerequisite* to a constitutionally valid sobriety checkpoint, nothing in our decision should be construed to suggest that any of the eight guidelines set forth in *Ingersoll,* including advance publicity (43 Cal.3d at pp. 1341-1347), are not *relevant* to a consideration of the intrusiveness of a sobriety checkpoint stop.

*Ingersoll* contemplates a *balancing* of all relevant factors in determining the constitutionality of a sobriety checkpoint. The People further contend that, because the United States Supreme Court's decision in *Sitz* relied upon a balancing test identical to that employed in *Ingersoll*, *Sitz* is corroborative of *Ingersoll*'s analysis and therefore lends no support to defendant's argument. Finally, the People argue that because *Sitz*, in evaluating the intrusiveness of a sobriety checkpoint, focused solely upon the nature of the detention, that decision implicitly rejects the notion that advance publicity is necessary if the constitutionality of a sobriety checkpoint is to be upheld.

Defendant contends *Ingersoll* and *Sitz each* establish advance publicity as a *requirement* of a constitutionally permissible sobriety checkpoint. Defendant also relies upon *People* v. *Morgan* (1990) 221 Cal.App.3d Supp. 1 [270 Cal.Rptr. 597] (a decision rendered by the Appellate Department of the San Francisco Superior Court after *Ingersoll*, but prior to *Sitz*), which affirmed a motion to suppress evidence on the ground the prosecution failed to provide sufficient evidence of advance publicity for the sobriety checkpoint—publicity that the court characterized as "essential." (*Id.* at p. Supp. 4.)[4]

As we shall explain, we reject defendant's argument that such publicity is necessary to the operation of a constitutionally permissible sobriety checkpoint. Although our decision in *Ingersoll* did not determine explicitly whether each of the safeguards discussed in that opinion was essential to the constitutional validity of a sobriety checkpoint, the United States Supreme Court's subsequent decision in *Sitz* demonstrates that advance publicity is not a constitutionally required prerequisite.

A. *Ingersoll v. Palmer*

In *Ingersoll*, we examined the question whether sobriety checkpoints are permissible under the United States and California Constitutions. The case involved a challenge brought by California taxpayers against various law enforcement officials and cited, as an example, a sobriety checkpoint program established by the Burlingame Police Department. As part of that program, law enforcement officials prepared a manual governing checkpoint operations, including guidelines established by the Attorney General, a cost analysis, factors affecting selection of the checkpoint location, required personnel and equipment, training, press relations and publicity, and procedures for a follow-up evaluation. The Burlingame sobriety checkpoint operated pursuant to these guidelines. (*Ingersoll, supra*, 43 Cal.3d at pp. 1325-1327.)

---

[4]*People* v. *Morgan, supra*, 221 Cal.App.3d Supp. 1, appears to be the only published decision in the nation (other than the Court of Appeal's decision in this case) that has invalidated a sobriety checkpoint exclusively upon the basis of a lack of adequate advance publicity.

■ In examining the challenge presented in *Ingersoll*, we held: "The touchstone for all issues under the Fourth Amendment and article I, section 13 of the California Constitution is reasonableness. (See *Terry* v. *Ohio* [1968] 392 U.S. 1, 19 [20 L.Ed.2d 889, 904, 88 S.Ct. 1868]; *People* v. *Hyde* [1974] 12 Cal.3d 158, 166 [115 Cal.Rptr. 358, 524 P.2d 830], conc. opn. [of Wright, C. J.] at pp. 172-173.) [¶] The federal test for determining whether a detention or seizure is justified balances the public interest served by the seizure, the degree to which the seizure advances the public interest and the severity of the interference with individual liberty. (*Brown* v. *Texas* (1979) 443 U.S. 47, 50-51 [61 L.Ed.2d 357, 361-362, 99 S.Ct. 2637].) In addition, federal constitutional principles require a showing of *either* the officer's reasonable suspicion that a crime has occurred or is occurring *or*, as an alternative, that the seizure is 'carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers.' (*Brown* v. *Texas, supra*, 443 U.S. at p. 51 [61 L.Ed.2d at p. 362], citing *Delaware* v. *Prouse* (1979) 440 U.S. 648, 663 [59 L.Ed.2d 660, 673-674, 99 S.Ct. 1391] and *United States* v. *Martinez-Fuerte* (1976) 428 U.S. 543, 558-562 [49 L.Ed.2d 1116, 1128-1131, 96 S.Ct. 3074].)" (*Ingersoll, supra*, 43 Cal.3d at p. 1329.)

■ The primary purpose of a sobriety checkpoint is to "prevent and deter conduct injurious to persons and property." (*Ingersoll, supra*, 43 Cal.3d 1321, 1331.) In *Ingersoll*, in applying *Brown*'s three-pronged balancing test, we determined that (1) "[d]eterring drunk driving and identifying and removing drunk drivers from the roadways undeniably serves a highly important governmental interest," and (2) sobriety checkpoints advance this interest. (43 Cal.3d at pp. 1338-1341.) ■ In examining the third prong of the *Brown* balancing test, which we rephrased as "the intrusiveness on individual liberties engendered by the sobriety checkpoints," we identified eight "factors important in assessing intrusiveness," noting that such factors "provide functional guidelines for minimizing the intrusiveness of the sobriety checkpoint stop." (*Id.* at p. 1341.)

The factors identified in *Ingersoll* are:

(1) Whether the decision to establish a sobriety checkpoint, the selection of the site, and the procedures for the operation of the checkpoint are made and established by supervisory law enforcement personnel;

(2) Whether motorists are stopped according to a neutral formula, such as every third, fifth or tenth driver;

(3) Whether adequate safety precautions are taken, such as proper lighting, warning signs, and signals, and whether clearly identifiable official vehicles and personnel are used;

(4) Whether the location of the checkpoint was determined by a policy-making official, and was reasonable, i.e., on a road having a high incidence of alcohol-related accidents or arrests;

(5) Whether the time the checkpoint was conducted and its duration reflect "good judgment" on the part of law enforcement officials;

(6) Whether the checkpoint exhibits sufficient indicia of its official nature (to reassure motorists of the authorized nature of the stop);

(7) Whether the average length and nature of the detention is minimized; and

(8) Whether the checkpoint is preceded by publicity. (*Ingersoll, supra,* 43 Cal.3d at pp. 1341-1347.)

In discussing the eighth factor—advance publicity—we stated as follows:

"Advance publicity is important to the maintenance of a constitutionally permissible sobriety checkpoint. Publicity [without disclosure of the precise location of the checkpoint] both reduces the intrusiveness of the stop and increases the deterrent effect of the roadblock.

"The concurring opinion in *State* ex rel. *Ekstrom* v. *Justice Ct. of State* [1983] [136 Ariz. 1] 663 P.2d 992, at page 1001 explained the value of advance publicity: 'Such publicity would warn those using the highways that they might expect to find roadblocks designed to check for sobriety; the warning may well decrease the chance of apprehending "ordinary" criminals, but should certainly have a considerable deterring effect by either dissuading people from taking "one more for the road," persuading them to drink at home, or inducing them to take taxicabs. Any one of these goals, if achieved, would have the salutary effect of interfering with the lethal combination of alcohol and gasoline. Advance notice would limit intrusion upon personal dignity and security because those being stopped would anticipate and understand what was happening.' (663 P.2d 992, 1001, conc. opn. [of] Feldman, J.; see also *State* v. *Deskins* [(1983) 234 Kan. 529] 673 P.2d 1174, 1182.)

"Publicity also serves to establish the legitimacy of sobriety checkpoints in the minds of motorists. Although the court in *Jones* v. *State* [Fla.Dist.Ct.App. 1984] 459 So.2d 1068, found that advance publicity was not constitutionally mandated for all sobriety roadblocks, nevertheless the court offered the observation, consistent with finding reasonableness under

the Fourth Amendment, that ' "[A]dvance publication of the date of an intended roadblock, even without announcing its precise location, would have the virtue of reducing surprise, fear, and inconvenience." [Citation.]' (*Id.* at p. 1080.)

"In the instant case, substantial advance publicity accompanied each sobriety checkpoint instituted." (*Ingersoll, supra*, 43 Cal.3d at pp. 1346-1347.)

After completing our discussion of the eight factors, we concluded in *Ingersoll* that, "while the intrusiveness of a sobriety checkpoint stop is not trivial, the enumerated safeguards operate to minimize the intrusiveness . . . . The fright or annoyance to motorists condemned in connection with roving stops is absent when the checkpoint is operated according to the guidelines followed here. [¶] On balance, the intrusion on Fourth Amendment interests is sufficiently circumscribed so that *it is easily outweighed* and justified by the magnitude of the drunk driving menace and the potential for deterrence." (*Ingersoll, supra*, 43 Cal.3d at p. 1347, italics added.)

Because the sobriety checkpoint program discussed in *Ingersoll* encompassed all eight factors, we had no occasion in that decision to examine the narrower question presented in this case—whether the absence of evidence relating to the factor of advance publicity is fatal to the constitutional validity of a sobriety checkpoint. As previously noted, that question was addressed by the appellate department of the superior court in *People* v. *Morgan, supra*, 221 Cal.App.3d Supp. 1.

### B. *People v. Morgan*

In *People* v. *Morgan, supra*, 221 Cal.App.3d Supp. 1, the defendant contended that a sobriety checkpoint was unconstitutional because it had not been preceded by advance publicity. In *Morgan*, evidence was introduced that a California Highway Patrol officer contacted a news service 24 to 48 hours in advance of the checkpoint's operation, following up with a telephone call on the evening of the checkpoint to advise the news service of the checkpoint's precise location. A television news crew was present at the checkpoint. No evidence was presented indicating whether the media actually conveyed any advance information to the public. In view of this factual record, the *Morgan* court upheld the order granting the motion to suppress evidence, observing that, because our opinion in *Ingersoll* referred to a finding of " 'substantial advance publicity,' " such publicity constituted a "requirement." (*Id.* at p. Supp. 4.)

Although our discussion in *Ingersoll* noted that one of the decisions upon which we relied in explaining the significance of advance publicity—*Jones*

v. *State* (Fla.Dist.Ct.App. 1984) 459 So.2d 1068, 1080—had determined that such publicity was *not* constitutionally mandated (see 43 Cal.3d at pp. 1346-1347), the court in *People* v. *Morgan, supra,* 221 Cal.App.3d Supp. 1, held that our discussion of the issue in *Ingersoll,* viewed as a whole, established that such publicity is constitutionally required. In *Morgan,* the court also concluded that the efforts undertaken by law enforcement officials to publicize the checkpoint in that case were inadequate, rendering the checkpoint stop unconstitutional, and the evidence obtained at the stop inadmissible at trial.[5]

### C. *Michigan State Police Dept. v. Sitz*

Three months after the *Morgan* decision (and three years after *Ingersoll*), the United States Supreme Court rendered its decision in *Sitz,* addressing for the first time the constitutionality of sobriety checkpoints. ▉ In analyzing the issue of the validity of the initial detention of a motor vehicle at such a checkpoint, the court in *Sitz* acknowledged at the outset "that a Fourth Amendment 'seizure' occurs when a vehicle is stopped at a checkpoint" (496 U.S. at p. 450 [110 L.Ed.2d at p. 420]), recognizing that "[t]he question thus becomes whether such seizures are 'reasonable' under the Fourth Amendment." (*Ibid.*) *Sitz* mirrored the opinion in *Ingersoll* in determining that the balancing analysis of *Brown* v. *Texas* (1979) 443 U.S. 47 [61 L.Ed.2d 357, 99 S.Ct. 2637] provided the governing framework for ascertaining the reasonableness of such a sobriety-checkpoint seizure.

In applying *Brown*'s balancing analysis, the court in *Sitz* first considered the importance and strength of the state interest sought to be served by such checkpoints, finding such interest to be of considerable weight and observing that "[n]o one can seriously dispute the magnitude of the drunken driving problem or the States' interest in eradicating it." (*Sitz, supra,* 496 U.S. at p. 451 [110 L.Ed.2d at p. 420].)

The court's opinion in *Sitz* then turned to "the weight bearing on the other scale—the measure of the intrusion on motorists stopped briefly at sobriety

---

[5]Although, as previously noted, *People* v. *Morgan* apparently is the only published decision (other than the Court of Appeal's decision in this case) that has found a sobriety checkpoint invalid based solely upon the absence of advance publicity, it is not the only California decision to have considered this particular one of *Ingersoll*'s eight guidelines. In *People* v. *Squire* (1993) 15 Cal.App.4th 775 [19 Cal.Rptr.2d 121], the Court of Appeal reversed an order granting a motion to suppress evidence obtained at a sobriety checkpoint, where an article in a local newspaper had publicized the forthcoming checkpoint operation. The court in *Squire* found it unnecessary to decide whether advance publicity was a prerequisite to a constitutionally valid sobriety checkpoint, because of the court's conclusion that, assuming such publicity was required, the single newspaper article was adequate for that purpose. (*Id.* at pp. 781-782.)

checkpoints," finding such intrusion to be "slight." (*Sitz, supra,* 496 U.S. at p. 451 [110 L.Ed.2d at p. 421].) The court explained: "We reached a similar conclusion as to the intrusion on motorists subjected to a brief stop at a highway checkpoint for detecting illegal aliens. See [*United States* v.] *Martinez-Fuerte* [(1976) 428 U.S. 543], at 558 [49 L.Ed.2d at 1128-1129]. We see virtually no difference between the levels of intrusion on law-abiding motorists from the brief stops necessary to the effectuation of these two types of checkpoints, which to the average motorist would seem identical save for the nature of the questions the checkpoint officers might ask." (496 U.S. at pp. 451-452 [110 L.Ed.2d at p. 421].) The court in *Sitz* thus concluded that the lower courts in that case had "accurately gauged the 'objective' intrusion, measured by the duration of the seizure and the intensity of the investigation, as minimal." (496 U.S. at p. 452 [110 L.Ed.2d at p. 421].)

Although the lower courts in *Sitz* had found the "objective" intrusion of the sobriety checkpoint to be minimal, those courts had found the "subjective" intrusion, that is, the potential for generating "fear and surprise" in motorists, to be substantial, and had invalidated the checkpoint on that basis. (*Sitz, supra,* 496 U.S. at p. 452 [110 L.Ed.2d at p. 421].) The high court's opinion in *Sitz* observed that, although the lower courts had agreed that "the guidelines governing checkpoint operation minimize[d] the discretion of the officers on the scene. . . ," those courts had concluded that "the checkpoints ha[d] the potential to generate fear and surprise in motorists . . . because the record failed to demonstrate that approaching motorists would be aware of their option to make U-turns or turnoffs to avoid the checkpoints. On that basis, the court[s] deemed the subjective intrusion from the checkpoints unreasonable." (496 U.S. at p. 452 [110 L.Ed.2d at p. 421].)

In rejecting the lower courts' conclusion on this point, the high court's opinion in *Sitz* explained that those courts had "misread our cases concerning the degree of 'subjective intrusion' and the potential for generating fear and surprise. The 'fear and surprise' to be considered are not the natural fear of one who has been drinking over the prospect of being stopped at a sobriety checkpoint but, rather, *the fear and surprise engendered in law-abiding motorists by the nature of the stop.* This was made clear in *Martinez-Fuerte.* Comparing checkpoint stops to roving patrols considered in prior cases, we said, [¶] 'we view checkpoint stops in a different light because the subjective intrusion—the generating of concern or even fright on the part of lawful travelers—is appreciably less in the case of a checkpoint stop. In [*United States* v.] *Ortiz* [(1975) 422 U.S. 891 (45 L.Ed.2d 623, 95 S.Ct. 2585)], we noted: [¶] ' "[*T*]*he circumstances surrounding a checkpoint stop and search are far less intrusive than those attending a roving-patrol stop. Roving patrols often operate at night on seldom-traveled roads, and their approach may*

*frighten motorists. At traffic checkpoints the motorist can see that other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion. 422 U.S. at [pp.] 894-895." ' [Citations.]* Here, checkpoints are selected pursuant to the guidelines, and uniformed police officers stop every approaching vehicle. The intrusion resulting from the brief stop at the sobriety checkpoint is for constitutional purposes indistinguishable from the checkpoint stops we upheld in *Martinez-Fuerte*." (*Sitz, supra*, 496 U.S. at pp. 452-453 [110 L.Ed.2d at pp. 421-422], italics added.)

■ Finally, in *Sitz* the United States Supreme Court explained that the lower courts in that case also had erred in applying the third prong of the *Brown* balancing test, which concerns " 'the degree to which the seizure advances the public interest.' " (*Sitz, supra*, 496 U.S. at p. 453 [110 L.Ed.2d at p. 422], quoting *Brown* v. *Texas, supra*, 433 U.S. at p. 51 [61 L.Ed.2d at p. 362].) The lower courts in *Sitz* had interpreted this language in *Brown* to require a judicial determination as to the effectiveness of the checkpoint program, and, on the basis of evidence adduced at trial, had concluded that the program failed the "effectiveness" test. The majority opinion in *Sitz* explained, however, that "[t]his passage from *Brown* was not meant to transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger. Experts in police science might disagree over which of several methods of apprehending drunk drivers is preferable as an ideal. But for purposes of Fourth Amendment analysis, the choice among such reasonable alternatives remains with the governmental officials who have a unique understanding of, and a responsibility for, limited public resources . . . ." (496 U.S. at pp. 453-454 [110 L.Ed.2d at p. 422].) The high court concluded in *Sitz* that the evidence presented in that case, which indicated that, on the average, sobriety checkpoints resulted in the arrest of approximately 1 percent of all motorists stopped, was sufficient to sustain the program's constitutionality under the "public interest" component of the *Brown* test.[6]

D. *Application of Sitz to the present case*

■ Relying upon *Sitz*, the People contend that the United States Supreme Court has determined that, under the federal Constitution, advance

---

[6]Following remand from the United States Supreme Court, the Michigan Supreme Court invalidated sobriety checkpoints in that jurisdiction on state constitutional grounds, without referring in its analysis to the advance-publicity component of Michigan's sobriety checkpoint program. (See *Sitz* v. *Michigan Dep't. of State Police* (1993) 443 Mich. 744 [506 N.W.2d 209].)

publicity is not an essential element of a valid sobriety checkpoint. Arguing to the contrary, defendant urges that *Sitz* is not controlling authority for the narrow question posed in the present case, and that instead we should adopt the reasoning of *People* v. *Morgan, supra,* 221 Cal.App.3d Supp. 1, to conclude that a sobriety checkpoint is constitutionally invalid in the absence of advance publicity. We are persuaded by the People's argument.

As noted above, in discussing the advance-publicity guideline in *Ingersoll,* we suggested that such publicity was significant in two respects—in reducing the intrusiveness of the sobriety checkpoint stop, and in increasing the deterrent value of the checkpoint itself. The reasoning of the *Sitz* majority makes it clear, however, that advance publicity is not a constitutional prerequisite to a valid sobriety checkpoint in either respect.

In analyzing the question of intrusiveness, the high court in *Sitz* considered both the "objective intrusion" of a checkpoint stop upon motorists, and the "subjective intrusion" involved. (*Sitz, supra,* 496 U.S. at p. 452 [110 L.Ed.2d at p. 421].) With respect to the objective-intrusion criterion, that is, "the duration of the seizure and the intensity of the investigation," the court in *Sitz* found that the objective intrusion occasioned by a sobriety checkpoint is no different from the intrusion involved in a border-control checkpoint, which the court previously had upheld. (496 U.S. at pp. 451-452 [110 L.Ed.2d at pp. 420-421] [citing *United States* v. *Martinez-Fuerte* (1976) 428 U.S. 543, 558 (49 L.Ed.2d 1116, 1128, 96 S.Ct. 3074)].) The presence or absence of advance publicity would appear to be irrelevant to the objective intrusion occasioned by a sobriety checkpoint, and defendant does not contend otherwise.

With respect to the subjective-intrusion criterion, that is, a sobriety checkpoint's potential for generating fear and surprise in motorists, the high court rejected the lower courts' conclusion that the subjective intrusion posed by the sobriety checkpoints involved in that case was unreasonable because of the approaching motorists' unawareness of their option to avoid the impending detention. Explaining that "[t]he 'fear and surprise' to be considered are . . . the fear and surprise engendered in law-abiding motorists by the nature of the stop," the court in *Sitz* contrasted sobriety checkpoints with the "roving patrols" considered in earlier cases, emphasizing that " ' "[a]t traffic checkpoints the motorist can see that other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion." ' [Citation.]" (*Sitz, supra,* 496 U.S. at pp. 452-453 [110 L.Ed.2d at pp. 421-422].) Because sobriety checkpoints share these characteristics with the border-patrol checkpoints upheld in *Martinez-Fuerte,* the court in *Sitz* concluded that "[t]he intrusion resulting

from the brief stop at the sobriety checkpoint is for constitutional purposes indistinguishable from the checkpoint stops . . . in *Martinez-Fuerte*." (496 U.S. at p. 453 [110 L.Ed.2d at p. 422].) Although Justice Stevens (joined by Justices Brennan and Marshall) argued vigorously in dissent that temporary sobriety checkpoints were more akin to roving patrols than to the permanent border-control checkpoint upheld in *Martinez-Fuerte*, because motorists were likely to be surprised upon encountering temporary sobriety checkpoints, the court in *Sitz* rejected that view, concluding that, for constitutional purposes, sobriety checkpoints are not impermissibly frightening or surprising—provided the motorist encountering the checkpoint " ' "can see that other vehicles are being stopped, [and] . . . can see visible signs of the officers' authority . . . ." ' " (496 U.S. at p. 453 [110 L.Ed.2d at p. 422] [quoting *United States* v. *Ortiz* (1975) 422 U.S. 891, 894-895 (45 L.Ed.2d 623, 627-628, 95 S.Ct. 2585)].)

Although publicizing in advance the location of a sobriety checkpoint may serve to minimize the surprise or inconvenience experienced by motorists alerted by the publicity, *Sitz*'s analysis of the subjective intrusion engendered by a sobriety checkpoint makes clear that advance publicity is not a constitutional prerequisite to ensuring that the subjective intrusion involved is confined to a reasonable level.

*Sitz* also makes clear that, however persuaded a court may be that advance publicity will increase the deterrent value of the checkpoint and thereby increase the procedure's effectiveness, the constitutionality of the checkpoint does not hinge upon such judicial evaluation of its effectiveness. ■ As we have seen, the high court in *Sitz* explained that the language contained in its prior decision in *Brown*, identifying " 'the degree to which the seizure advances the public interest' " as one factor in the balancing process, "was not meant to transfer from politically accountable officials to the courts" the responsibility for making policy decisions among reasonable alternative law enforcement techniques. In so concluding, the court emphasized that "for purposes of Fourth Amendment analysis, the choice among such reasonable alternatives remains with the governmental officials who have a unique understanding of, and a responsibility for, limited public resources . . . ." (*Sitz, supra*, 496 U.S. at pp. 453-454 [110 L.Ed.2d at p. 422].)

■ Thus, *Sitz* establishes that a sobriety checkpoint may not be held violative of the federal Constitution simply because a court may believe that the law enforcement interests sought to be served by the checkpoint would more effectively be served by a level of advance publicity greater than that believed appropriate by politically accountable officials. The nature and degree of publicity sought or provided by law enforcement officials prior to

the operation of sobriety checkpoints inevitably involve policy judgments reflecting not only the fiscal resources available to the agencies in question, but also a determination as to whether to attempt to achieve greater deterrence during a specified time period (e.g., a holiday weekend) or at a particular location (e.g., near a professional sports stadium), or whether, instead, to seek the more generalized deterrence arguably obtainable when motorists learn—through personal experience or by word of mouth—that sobriety checkpoints may be established *without* advance publicity.[7] *Sitz* establishes that the constitutionality of a sobriety checkpoint should not hinge upon a court's evaluation of the wisdom of policy decisions made by accountable law enforcement officials.

Nonetheless, courts have recognized that the absence of advance publicity does not so lessen the deterrent effect of a sobriety checkpoint as to tip the scales in favor of the detained motorist who subsequently challenges the checkpoint. A sobriety checkpoint conducted without advance publicity is unlikely to be totally without deterrent effect, at least among those motorists who pass through, or by, the checkpoint. (See *People* v. *Rister* (Colo. 1990) 803 P.2d 483, 489 ["[T]he announcement *and establishment* of a sobriety checkpoint undoubtedly had some effect on advancing the state's interest in preventing drunken driving." (Italics added.)].) If, in accordance with the *Ingersoll* guidelines, the checkpoint is established on a roadway "having a high incidence of alcohol related accidents and/or arrests," the deterrent effect may be considerable. (*Ingersoll*, *supra*, 43 Cal.3d at p. 1343.) Also, if law enforcement agencies choose to publicize the number of arrests made at sobriety checkpoints, an additional deterrent effect may be realized. Thus, even in the absence of advance publicity, a sobriety checkpoint has the potential of substantially furthering the state's vital interest in deterring motorists from driving "under the influence."

In arguing that *Sitz* must be read to establish advance publicity as a prerequisite to a constitutionally valid sobriety checkpoint program, defendant relies upon the circumstance that the statement of facts in *Sitz* indicates

---

[7]Were this court to hold that advance publicity is necessary to the operation of a constitutionally permissible sobriety checkpoint, law enforcement officials and our courts inevitably would be plagued with a host of operational concerns that they are ill-suited to address, and upon which reasonable minds easily could differ, leading to the uneven application of advance-publicity rules. Among these concerns are the geographical area in which the advance notice must be provided, the type and number of media organizations that must be contacted, the minimum advance-notice period, the requisite content of the notice, whether the notice should be provided in languages other than English, the number of times the notice must be repeated, the typeface size of the notice intended for dissemination in the print media, and whether law enforcement agencies must purchase necessary airtime or publishing space in the event media organizations decline to convey the notice as a public service. (See generally, *People* v. *Squire*, *supra*, 15 Cal.App.4th 775, 778-782.)

the sobriety checkpoint at issue in that case was established under guidelines providing for some form of unspecified publicity. (See *Sitz, supra,* 496 U.S. at p. 447 [110 L.Ed.2d at p. 418].) Defendant maintains that, because the sobriety checkpoint program in *Sitz* contained advance publicity, the decision in that case cannot be relied upon as authority for the proposition that advance publicity is not constitutionally required.

Defendant's claim is untenable. In analyzing the constitutionality of the sobriety checkpoint challenged in *Sitz,* the court's opinion placed no reliance upon, and indeed made no reference to, any advance publicity that might have been provided regarding the checkpoint. It is well settled that language contained in a judicial opinion is " 'to be understood in the light of the facts and issue then before the court, and an opinion is not authority for a proposition not therein considered. [Citation.]' " (*People* v. *Superior Court (Marks)* (1991) 1 Cal.4th 56, 65-66 [2 Cal.Rptr.2d 389, 820 P.2d 613], quoting *Ginns* v. *Savage* (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689].) The reasoning contained in the *Sitz* opinion indicates that the validity of a sobriety checkpoint turns upon the duration of the stop and the intensity of the investigation, and upon the adequacy of measures taken to apprise motorists who encounter the checkpoint that it is an official law enforcement operation and that other motorists also are being detained in regular fashion. Particularly in light of the high court's implicit rejection of Justice Stevens's dissenting opinion, which argued that the "surprise" nature of sobriety checkpoints rendered them unconstitutional, we conclude that the court's opinion in *Sitz* reasonably must be understood to hold that advance publicity is not a prerequisite to a constitutionally permissible sobriety checkpoint. (Accord, *United States* v. *Ziegler* (N.D.Cal. 1993) 831 F.Supp. 771.)[8]

### E. *Other authority*

Although the United States Supreme Court's reasoning in *Sitz* demonstrates the untenable nature of defendant's position, it also is instructive to examine court decisions from other jurisdictions that have addressed the question whether advance publicity is necessary to the operation of a constitutionally permissible checkpoint. Although nearly all of these decisions predate *Sitz,* we briefly review them to demonstrate that, even prior to *Sitz,*

---

[8]In view of our holding, we need not, and do not, undertake an assessment of the relative merits of publicity efforts utilized in connection with other sobriety checkpoint programs. (See, e.g., *State* v. *Super. Court in and for the County of Pima* (1984) 143 Ariz. 45 [691 P.2d 1073] [press releases, purchase of advertisements in the media]; *Commonwealth* v. *Trumble* (1985) 396 Mass. 81 [483 N.E.2d 1102] [press releases sent to more than 400 media outlets, and law enforcement officials personally spoke to media representatives]; *Little* v. *State* (1984) 300 Md. 485 [479 A.2d 903] [extensive statewide publicity campaign].)

defendant's position was rejected overwhelmingly by the state courts that have considered the issue now before us.

We commence our survey of sister state courts with an examination of those decisions that address the precise issue that confronts us in the present case—whether advance publicity is necessary to the operation of a constitutionally permissible checkpoint.

In *People* v. *Bartley* (1985) 109 Ill.2d 273 [93 Ill.Dec. 347, 486 N.E.2d 880], the Illinois Supreme Court upheld the constitutionality of a sobriety roadblock, finding that the roadblock had been operated pursuant to guidelines that served to limit the intrusiveness of the detention. Although the media was advised in advance of the roadblock, little (if any) media coverage actually preceded its operation, and the Illinois Supreme Court considered the case as one involving a lack of advance publicity. The court noted that such publicity "serves to minimize any apprehension" on the part of detained motorists, and promotes the goal of deterrence. (*Id.* at p. 888.) Notwithstanding these observations, the court held that the failure of law enforcement officials to publicize the roadblock in advance was not fatal to its constitutionality. "Given the other factors serving to reduce the subjective intrusion, the lack of advance publicity is not sufficient to invalidate this roadblock." (*Ibid.*; accord, *People* v. *Little* (1987) 162 Ill.App.3d 6 [515 N.E.2d 846, 849].)

Similarly, in *State* v. *DeCamera* (1989) 237 N.J. Super. 380 [568 A.2d 86], the defendant, having been convicted of driving under the influence of alcohol, challenged the constitutionality of the sobriety roadblock on the ground there had been no advance published notice of the roadblock. In rejecting this challenge, the court held: "We are cognizant of the fact that some positive results might flow from advance newspaper notice of police roadblocks. It is possible that if the public was aware that there was to be a sobriety checkpoint on a particular day, but was not aware of its location, intoxicated persons might be less likely to attempt to drive. This heightened effectiveness, however, does not rise to the level of a constitutional imperative." (*Id.* at p. 88; accord, *State* v. *Valencia Olaya* (1987) 105 N.M. 690 [736 P.2d 495, 498] ["Because no one guideline is dispositive," the court upheld the constitutionality of a sobriety roadblock where, with the exception of advance publicity, the roadblock "satisfied the intent" of each guideline subsequently set forth in *Ingersoll*].)

Other state courts that have upheld the constitutionality of sobriety checkpoints, operated pursuant to guidelines that included advance publicity, have characterized such publicity—as we did in *Ingersoll*—as a factor or guideline to be considered as part of a court's balancing analysis, rather than as a

prerequisite. (See *State* v. *Moskal* (1991) 246 N.J.Super. 12 [586 A.2d 845]; *People* v. *Rister, supra,* 803 P.2d 483 [post-*Sitz* decisions, neither of which interpreted *Sitz* to require advance publicity]; see also *Crandol* v. *City of Newport News* (1989) 238 Va. 697 [386 S.E.2d 113]; *State* v. *Leighton* (Me. 1988) 551 A.2d 116; *City of Las Cruces* v. *Betancourt* (1987) 105 N.M. 655 [735 P.2d 1161]; *State* v. *Garcia* (Ind. 1986) 500 N.E.2d 158; *Commonwealth* v. *Trumble, supra,* 396 Mass. 81 [483 N.E.2d 1102, 1107-1108]; *Lowe* v. *Commonwealth* (1985) 230 Va. 346 [337 S.E.2d 273]; *Little* v. *State, supra,* 479 A.2d 903; *State* v. *Deskins* (1983) 234 Kan. 529 [673 P.2d 1174]. Cf. *State* v. *McMahon* (Me. 1989) 557 A.2d 1324 [upholding the validity of a sobriety checkpoint operated pursuant to neutral, unwritten guidelines, not preceded by advance publicity, and where the state did not present evidence establishing the lack of available superior methods of apprehension].)[9]

In addressing the narrower question whether advance publicity, *including reference to the location of a sobriety checkpoint,* is required, our sister courts uniformly have held that such precision is unnecessary and counterproductive, because publicizing this type of information would allow motorists to avoid the checkpoint, thereby lessening its deterrent effect. (See *State* v. *Garcia, supra,* 500 N.E.2d 158, 162; *People* v. *Scott* (1984) 63 N.Y.2d 518 [483 N.Y.S.2d 649, 473 N.E.2d 1, 5]; *State* v. *Super. Court in and for the County of Pima, supra,* 143 Ariz. 45 [691 P.2d 1073, 1077]; see also *Commonwealth* v. *Leninsky* (1986) 360 Pa.Super. 49 [519 A.2d 984, 993, fn. 16]; *State* v. *Martin* (1985) 145 Vt. 562 [496 A.2d 442, 450].)

Those state courts that, prior to *Sitz,* invalidated sobriety checkpoints did so for reasons unrelated to the question whether advance publicity is constitutionally mandated. These decisions can be divided into two groups: those that invalidated sobriety checkpoints as per se unconstitutional under the federal Constitution, or, more commonly, the respective state constitution

---

[9]Other courts have upheld the constitutionality of sobriety checkpoints without discussing the matter of advance publicity, and, therefore, their decisions are not inconsistent with those decisions, discussed in the text, in which advance publicity was held not to be a constitutional prerequisite. (See *Christopher* v. *State* (1991) 202 Ga.App. 40 [413 S.E.2d 236]; *Chock* v. *Commissioner of Public Safety* (Minn.Ct.App. 1990) 458 N.W.2d 692 [applying *Sitz*]; see also *Evans* v. *State* (1989) 190 Ga.App. 856 [380 S.E.2d 332]; *State* v. *Riley* (Iowa Ct.App. 1985) 377 N.W.2d 242; *State* v. *Alexander* (1985) 22 Ohio Misc.2d 34 [489 N.E.2d 1093]; *People* v. *Torres* (1984) 125 Misc.2d 78 [478 N.Y.S.2d 771]; *People* v. *Peil* (1984) 122 Misc.2d 617 [471 N.Y.S.2d 532]; *State* v. *Golden* (1984) 171 Ga.App. 27 [318 S.E.2d 693]; *Kinslow* v. *Commonwealth* (Ky.Ct.App. 1983) 660 S.W.2d 677; *State* v. *Coccomo* (1980) 177 N.J. Super. 575 [427 A.2d 131]; cf. *Cains* v. *State* (Ala.Ct.App. 1989) 555 So.2d 290; *State* v. *Welch* (Mo.Ct.App. 1988) 755 S.W.2d 624 [surveying other decisions that cited advance publicity as a factor, but not relying upon that factor in upholding the reasonableness of the seizure]; *Stark* v. *Perpich* (D.Minn. 1984) 590 F.Supp. 1057, 1058 [denying motion to enjoin proposed "drunk driving survey" of motorists].)

(see *Pimental* v. *Department of Transportation* (R.I. 1989) 561 A.2d 1348; *State* v. *Church* (La. 1989) 538 So.2d 993; *Higbie* v. *State* (Tex.Crim.App. 1989) 780 S.W.2d 228; *State* v. *Henderson* (1988) 114 Idaho 293 [756 P.2d 1057; *City of Seattle* v. *Mesiani* (1988) 110 Wn.2d 454 [755 P.2d 775]; *Nelson* v. *Lane County* (1987) 304 Ore. 97 [743 P.2d 692]; *State* v. *Koppel* (N.H. 1985) 499 A.2d 977; *State* v. *Smith* (Okla.Crim.App. 1984) 674 P.2d 562; *State* v. *Olgaard* (S.D. 1976) 248 N.W.2d 392, 394-395), and those decisions that invalidated sobriety checkpoints on the ground they were operationally defective, because they were not operated pursuant to neutral criteria, or because they allowed field officers to exercise unbridled discretion in operating the checkpoint (see *State* v. *Parms* (La. 1988) ·523 So.2d 1293; *Webb* v. *State* (Tex.Crim.App. 1987) 739 S.W.2d 802; *State* v. *Jones* (Fla. 1986) 483 So.2d 433; *Commonwealth* v. *Amaral* (1986) 398 Mass. 98 [495 N.E.2d 276]; *State* v. *Crom* (1986) 222 Neb. 273 [383 N.W.2d 461]; *Commonwealth* v. *Leninsky, supra,* 519 A.2d 984; *State* v. *Kirk* (1985) 202 N.J. Super. 28 [493 A.2d 1271]; *State* v. *Muzik* (Minn.Ct.App. 1985) 379 N.W.2d 599; *State* ex rel. *Ekstrom* v. *Justice Ct. of State* (1983) 136 Ariz. 1 [663 P.2d 992]; *Commonwealth* v. *McGeoghegan* (1983) 389 Mass. 137 [449 N.E.2d 349, 37 A.L.R.4th 1]; see also *Commonwealth* v. *Tarbert* (1987) 517 Pa. 277 [535 A.2d 1035] [roadblocks exceeded statutory parameters]).

In invalidating sobriety checkpoints because they were not operated pursuant to neutral criteria, or because they allowed field officers to exercise unbridled discretion, several decisions in this group of cases observed that such publicity is not essential. (See *Commonwealth* v. *Amaral, supra,* 495 N.E.2d 276, 278; *Commonwealth* v. *McGeoghegan, supra,* 449 N.E.2d 349, 353; *State* v. *Jones, supra,* 483 So.2d 433, 439; *State* v. *Muzik, supra,* 379 N.W.2d 599, 604, fn. 4.)

As is disclosed by our survey of the foregoing decisions from other jurisdictions, the weight of judicial authority has viewed advance publicity as insignificant or (consistent with our own decision in *Ingersoll*) has considered such publicity as a factor, but not a prerequisite, in assessing the constitutionality of sobriety checkpoints. Those decisions that have disapproved sobriety checkpoints, with the exception of the appellate department opinion in the California case of *People* v. *Morgan, supra,* 221 Cal.App.3d Supp. 1, and the Court of Appeal's opinion in this case, reached their conclusions based upon issues unrelated to the question whether advance publicity is essential to the operation of a constitutionally permissible sobriety checkpoint.

CONCLUSION

 In light of the United States Supreme Court's decision in *Michigan State Police Dept.* v. *Sitz, supra,* 496 U.S. 444, and consistent with the weight

of authority examined above, we conclude that the operation of a sobriety checkpoint conducted in the absence of advance publicity, but otherwise in conformance with the guidelines we established in *Ingersoll* v. *Palmer*, *supra*, 43 Cal.3d 1321, does not result in an unreasonable seizure within the meaning of the Fourth Amendment to the United States Constitution.[10] Accordingly, we reverse the judgment of the Court of Appeal and direct that court to affirm the judgment of conviction of driving under the influence of alcohol rendered by the municipal court.

Lucas, C. J., Kennard, J., Arabian, J., and Baxter, J., concurred.

PANELLI, J., Dissenting.—In *Ingersoll* v. *Palmer* (1987) 43 Cal.3d 1321 [241 Cal.Rptr. 42, 743 P.2d 1299] (*Ingersoll*) this court held by a vote of four to three that it is constitutionally permissible for a police officer to stop a motorist at a sobriety checkpoint even though the officer does not suspect, reasonably or otherwise, that the motorist is intoxicated. The court reached that conclusion by applying the administrative search rationale articulated in *Brown* v. *Texas* (1979) 443 U.S. 47 [61 L.Ed.2d 357, 99 S.Ct. 2637] and by comparing sobriety roadblocks to metal detectors at airports. (See *Ingersoll*, *supra*, 43 Cal.3d at pp. 1329-1331.)

Justice Mosk and I joined Justice Broussard's dissent in *Ingersoll*. Since then, most courts have yielded to the overwhelming public pressure to approve this type of warrantless, suspicionless search. Under these circumstances there is little point in writing another long dissent. However, when future courts are asked to approve still more intrusive "administrative" searches by analogy to the sobriety checkpoint, it may be useful for them to recall the reasons why some of us were unwilling to take even the first small steps in this direction. In Justice Broussard's words:

"The Fourth Amendment is highly inexpedient to law enforcement, yet to date we have not allowed mass detentions on the theory that these might prove useful in combating crime. I see no basis for distinguishing a drunk driving roadblock from any other mass detention established to prevent crime or apprehend wrongdoers. While drunk driving is a revolting crime, it is not the only one which the community abhors. If we abandon constitutional protections to combat every abhorrent crime which has captured the public's attention, we will find ourselves naked and unprotected in a hurry." (*Ingersoll*, *supra*, 43 Cal.3d at p. 1356 (dis. opn. of Broussard, J.).)

At least the *Ingersoll* court saw the danger to our constitutional protections. Because it did, the court tempered its holding by distilling from the

---

[10]To the extent *People* v. *Morgan*, *supra*, 221 Cal.App.3d Supp. 1, is inconsistent with the views expressed herein, it is disapproved.

relevant cases a set of "functional guidelines for minimizing the intrusiveness . . . ." (*Ingersoll, supra*, 43 Cal.3d at p. 1341.) The court explained its reasons for including one of those guidelines, advance publicity, in these words: "Advance publicity is important to the maintenance of a constitutionally permissible sobriety checkpoint. Publicity both reduces the intrusiveness of the stop and increases the deterrent effect of the roadblock." (*Id.* at p. 1346.)

For six years the *Ingersoll* guidelines, including advance publicity, have served the state well by minimizing the intrusiveness of one type of warrantless, suspicionless search. Today, however, the majority concludes that "the United States Supreme Court's analysis of the constitutionality of sobriety checkpoints in *Michigan State Police Dept.* v. *Sitz* (1990) 496 U.S. 444 . . . establishes that advance publicity is not a constitutional prerequisite to the operation of such a checkpoint." (Maj. opn., *ante*, p. 931.)

I am not entirely sure what this means. Perhaps the majority means to say only this: While the presence or absence of advance publicity is still *relevant* in assessing the intrusiveness, and thus the constitutionality, of sobriety checkpoints, an unpublicized checkpoint can still pass constitutional muster if it obtains a high score on the other seven *Ingersoll* factors. In a footnote the majority invites this interpretation with the statement that "nothing in our decision should be construed to suggest that any of the eight guidelines set forth in *Ingersoll*, including advance publicity (43 Cal.3d at pp. 1341-1347), are not *relevant* to a consideration of the intrusiveness of a sobriety checkpoint stop." (Maj. opn., *ante*, p. 933, fn. 3, italics in original.)

If this is the correct interpretation of the majority opinion, then it is still possible as a matter of logic that the lack of advance publicity in a particular case will be decisive in holding unconstitutional a checkpoint that does not score high on the other seven *Ingersoll* factors.

Unfortunately, the opinion does not clearly say this. The majority repeats, but will not reaffirm, *Ingersoll*'s statement that advance publicity is "*important* to the maintenance of a constitutionally permissible sobriety checkpoint." (*Ingersoll, supra*, 43 Cal.3d at p. 1346, italics added; cf. maj. opn., *ante*, p. 931.) Then, as if to take back what the footnote gives, the majority declares that "a sobriety checkpoint may not be held violative of the federal Constitution simply because a court may believe that the law enforcement interests sought to be served by the checkpoint would more effectively be served by a level of advance publicity greater than that believed appropriate by politically accountable officials." (Maj. opn., *ante*, p. 943.)

In my view the majority wants it both ways. Clearly it does not wish to encourage law enforcement officials to announce sobriety checkpoints in

advance, but it also does not want to hold that advance publicity is irrelevant.

One good reason not to hold that advance publicity is irrelevant would be that the high court's opinion in *Michigan State Police Dept.* v. *Sitz* (1990) 496 U.S. 444 [110 L.Ed.2d 412, 110 S.Ct. 2481], on which the majority places so much weight, would not support such a holding. *Sitz* was an action for declaratory and injunctive relief against the operation of a sobriety checkpoint program in Michigan. The plaintiffs "challenge[d] only the use of sobriety checkpoints generally" (*id.* at p. 450 [110 L.Ed.2d at p. 420]), and the court held that such checkpoints are constitutional if they satisfy the balancing test set out in *Brown* v. *Texas*, *supra*, 443 U.S. 47. This holding neither compels us, nor gives us a reason, to abandon the guidelines that we adopted in *Ingersoll*, *supra*, 43 Cal.3d 1321, for applying the *Brown* test in the context of sobriety checkpoints. This is especially true since the guidelines of the checkpoint program that the high court approved in *Sitz* did include publicity. (*Sitz*, *supra*, 496 U.S. at p. 447 [110 L.Ed.2d at p. 418]; see also *id.* at p. 475, fn. 19 [110 L.Ed.2d at p. 436] (dis. opn. of Stevens, J.).)

In summary, the majority invites law enforcement officials to dispense with advance publicity while reassuring those who fear for the vitality of the Fourth Amendment that all of the *Ingersoll* factors, including advance publicity, are still in effect. In view of this ambiguous message, the only prudent course of action is for law enforcement officials and courts to continue to determine in each case whether the lack of advance publicity has made each particular checkpoint too intrusive to satisfy the Fourth Amendment. Only then can we be confident that the Fourth Amendment is still alive and well.

Mosk, J., concurred.